CRESCENT COTTON OIL CO. *v.* UNION GIN & LUMBER CO.

*(Jackson,* April Term, 1917.)

1. **SALES. Contract. Construction. Warranty. "Good." "Sound."**

The words "good sound cotton seed when loaded out," in a contract for the sale of cotton seed, amounted to a warranty, since while the word "good" is not of itself a warranty, the word "sound" is the usual and appropriate words to be used in reference to the quality of chattels, and "good" emphasizes it, and no form of words is necessary to create a warranty, but the question is ordinarily one of ascertaining the intention of the parties. (*Post, pp.* 63-68.)

Cases cited and approved: Pasley v. Freeman, 3 Tenn. Rep., 57; Williams v. Hurt, 21 Tenn., 68; Allen v. Todd, 6 Lans. (N. Y.), 222; Eden v. Parkison, 2 Doug., 735.

Cases cited and distinguished: McGregor v. Penn, 17 Tenn., 76; Chapman v. Murch, 19 Johns, 289; Salmon v. Wood, 12 Com. Law, 95; Kearly v. Duncan, 38 Tenn., 389.

2. **SALES. Contract. Construction.**

A contract for the sale of five hundred tons of good sound cotton seed when loaded out, to be delivered in the future and to be weighed and accepted by a representative of the purchaser, did not *ipso facto* pass title to the cotton seed. (*Post, pp.* 68-76.)

3. **SALES. Express warranty. Inspection by buyer.**

Where a contract for the sale of cotton seed to be delivered in the future contained an express warranty as to quality, an inspection made by the purchaser's agent, who dictated the contract, on the day the contract was made, which did not include all of the cotton seed, did not preclude the purchaser from relying upon the warranty. (*Post, pp.* 68-76.)

Cotton Oil Co. v. Gin & Lumber Co.

Case cited and approved: Keely v. Turbeville, 79 Tenn., 339.

Cases cited and distinguished: Barnard v. Kellogg, 10 Wall., 388; Kellogg Bridge Co. v. Hamilton, 110 U. S., 108.

4. **SALES.  Evidence.  Sufficiency.**

In an action for breach of a contract for the sale of cotton seed, which contained a warranty as to quality, evidence *held* to show that the seller failed to furnish cotton seed of the quality warranted, and hence broke the contract.  (*Post, p.* 76.)

FROM SHELBY

Appeal from the Chancery Court of Shelby County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court. —F. H. HEISKELL, Chancellor.

L. T. FITZHUGH, for plaintiff.

H. C. MOORMAN and T. K. RIDDICK, for defendant.

MR. W. B. SWANEY, Special Judge, delivered the opinion of the Court.

This suit was brought by the Crescent Cotton Oil Company in the chancery court of Shelby county against the Union Cotton Gin & Lumber Company to recover the sum of $750 as damages for the breach of the following contract:

"Somerville, Tenn., Dec. 22, 1913.

"This is to certify that we this day sold to the Crescent Cotton Oil Company, of Memphis, Tenn.:

"Five hundred (500) tons of good sound cotton seed when loaded out. To be 'delivered by Feb. 1, 1914, at twenty-six dollars ($26) per ton f. o. b. cars Somerville, Tenn. To be weighed and accepted by representative of the Crescent Cotton Oil Company over Union Gin & Lumber Company scales at Somerville, with sight draft and bill of lading attached on each car as loaded out.

"UNION GIN & LBR. Co.,

"JOHN W. DAY.

"Including Whit Wilkinson's seed."

There was a written acceptance of said offer by complainant under date of December 23, 1913, as follows:

"Union Gin & Lbr. Co., Somerville, Tenn.—Gentlemen: We beg to acknowledge receipt of your confirmation of the 22d covering sale to us of 500 tons of good sound cotton seed. This is in order, and we beg to confirm this transaction, and are pleased to have put through this business with you.

"We would suggest that you figure on beginning to ship this seed some time after Jany. 15th, say about Jany. 20th. We would like to arrange matters so that we could clean it all up within a few days after we once get started.

"Yours truly

"AB-PC.        "CRESCENT COTTON OIL Co."

There is no controversy as to the execution of the contract. The chief contention is as to whether the language "good sound cotton seed when loaded out,"

found in the contract, constituted a warranty as to the quality of said cotton seed, and whether complainant can rely upon it as a warranty, in view of an alleged inspection of said cotton seed made by its agent, Prewett, just before making, or contemporaneous with making, said contract.  At the time of making said contract, complainant was a corporation engaged in maufacturing cotton seed oil and cotton seed products in Memphis, and defendant was a corporation owning and operating a cotton gin in Somerville, and buying and selling cotton seed.

This contract was made on December 22, 1913, through the agency of one Prewett, who visited Somerville on that date and made an inspection of at least a portion of said cotton seed in person, and shortly thereafter obtained the written offer from defendant to sell said cotton seed upon the terms set out therein.  The proof is not clear whether Prewett undertook to accept said offer, or complainant required it to be approved in writing; but this fact is immaterial, as there was a written acceptance next day by complainant.  Complainant avers that said contract constituted a warranty as to the soundness of said cotton seed, and that defendant breached said contract, and failed and refused to deliver five hundred tons of "good sound cotton seed when loaded out," as provided in said contract, at Somerville, or within reasonable time thereafter, and that complainant stood ready, able, and willing to comply with its part thereof, and shortly thereafter, after

demand and refusal, notified defendant of its intention to purchase said cotton seed in the market to fill the contract, and did do so at a loss of $750, for which it sued.

The details leading up to the suit are set out in the bill, but for the purposes of this opinion they need not be further stated now.

The answer of defendant admitted the execution of the contract, but averred that the sale was made with reference to certain cotton seed which defendant then had in possession; that said seed were inspected and examined by complainant's agent, Prewett, who made the contract, and that complainant knew exactly what it was buying. It is in effect claimed that the contract does not constitute a warranty as to the quality of the cotton seed, that said contract was intended to and does cover the cotton seed on hand, and that the inspection made by complainant's agent constituted an acceptance of these identical seed; that defendant began early in January, 1914, to get ready to load and ship said cotton seed, and so notified complaiant, when, after some delay, complainant sent its agent, one Ford, to Somerville to weigh said seed on cars, and that said agent wrongfully refused to accept and pay for said seed under the contract, and in a few days the officers of complainant also visited Somerville, and wrongfully refused to accept and pay for said seed, and undertook to get defendant to accept a smaller price than that named in the contract for said seed, which was

refused.  Thereupon defendant sold said cotton seed to the Memphis Cotton Oil Company at the price of $25.50 per ton, thus entailing a loss upon defendant of $250, and the answer was filed as a cross-bill to recover said sum from complainant.

The cross-bill was answered by complainant, denying all material allegations.  It thus appears that both parties are relying upon the contract.

Considerable proof was taken by both parties. The cause was heard before Chancellor Heiskell, with the result that he dismissed the cross-bill and gave complainant a decree against defendant for $750, with interest and costs.

Defendant prayed and perfected an appeal to the court of civil appeals, and that court reversed the chancellor as to the decree against defendant, and dismissed the original bill, and affirmed the decree dismissing the cross-bill.  The case is here by petition for *certiorari* in behalf of complainant only.

Numerous errors are assigned, but we need only consider two questions of law and one question of fact.

The first question of law arises upon a construction of the contract.  Does the language, "good sound cotton seed when loaded out," amount to a warranty?  The chancellor properly held that this language did constitute a warranty as to the quality of the cotton seed, and in this we think he was correct.  It is not necessary to enter into any disquisition as to what language is required to create a war-

ranty, or to cite authorities beyond this State. It is not claimed that the word "good," in and of itself, will make a warranty. The word "sound," however, is the usual and most appropriate word to use with reference to the quality of many chattels, and "good" simply emphasizes it. No form of words is necessary to be used to create a warranty. The question is ordinarily one of ascertaining the intention of the parties. Controversies generally arise in cases where the language is not as plain and easily understood as that used here. It is sometimes exceedingly difficult, where the intention is to be gathered from conversations, as to whether the party using it intended it as a mere expression of opinion or as a warranty. The same trouble does not arise in the construction of written contracts usually. The language used here is not difficult to understand and has been construed by this court in many cases. In *McGregor* v. *Penn,* 9 Yerg. (17 Tenn.), 76, Judge Turley says:

"It is certainly true that, when an action is founded on a warranty of the soundness of a chattel, a warranty must be proved; but it is not necessary that the vendor should use the express words, 'I warrant the soundness.' Any words of equivalent import, showing the intention of the parties that there should be a warranty, will suffice. In the case of *Chapman* v. *Murch,* 19 Johns., 289, 10 Am. Dec., 227, Chief Justice Spencer says 'that if a man should say, on the sale of a horse, "I promise you the horse

is sound,'' it is difficult to conceive that this is not a warranty, and an express one, too.' Peake, in his treatise upon Evidence, 228, says: 'In general, any representations made by defendant of the state of the thing sold, at the time of the sale, will amount to a warranty.' And in case of *Salmon* v. *Wood,* 12 Com. Law, 95, before referred to, the court says 'that if the plaintiff, in a letter to the defendant, says, ''You remember 'you represented the horse to me as a five-year old,'' to which the defendant answers, ''The horse is as I represented,'' this amounts to a warranty.' ''

In *Kearly* v. *Duncan,* 1 Head (38 Tenn.), 398, 73 Am. Dec., 179, the question was as to whether the words, ''said negroes sound in body and mind, and slaves for life,'' in a written agreement, constituted a warranty. McKINNEY, Judge, said:

''1. The court, in substance, instructed the jury that the words 'said negroes sound in body and mind,' contained in the ,foregoing instrument amounted to a warranty of soundness of the slaves, and that said warranty was personally binding on the defendant.

''Both of these instructions, we think, are strictly correct. It was unquestionably the province of the court to interpret the language of the instrument, and also to declare its legal effect; and, in doing so, it was proper for the court, upon the facts of this case, to look to the face of the instrument alone.

That the words of the instrument contain a clear and explicit warranty is a proposition too plain to admit of discussion; and it is no less clear, upon a familiar, well-established principle, that the defendant is personally liable upon the warranty.''

In the *Kearly Case,* supra, it was also held that:

''When a person has executed an instrument of writing, in the absence of fraud, mistake, or unfairness, parol evidence is not admissible to change his liability created by the written instrument. It must be taken to contain conclusive evidence of the final and deliberate intention and agreement of the parties.''

In *Gregory* v. *Underhill,* 6 Lea (74 Tenn.), 210, it is said:

''No special form of words is necessary to create a warranty. If the vendor, in a sale of chattels, make any assertion or affirmation, which is not a mere expression of judgment or opinion, respecting the kind, quality, or condition of the article sold, upon which he intends that the purchaser shall rely as an inducement to the purchase, and upon which the purchaser does rely, it is a warranty, provided it appear in evidence that it was so intended. *Pasley* v. *Freeman,* 3 Term. Rep., 57. A warranty must be proved, either positively or circumstantially, and any words showing the intention of the parties that there should be a warranty will suffice, the existence of the intention being a question of fact for the determination of the jury. *McGregor* v. *Penn,* 9 Yerg.,

74. And a warranty may be made of a future event. *Williams* v. *Hurt,* 2 Humph., 68; *Allen* v. *Todd,* 6 Lans. (N. Y.), 222; *Eden* v. *Parkison,* 2 Doug., 735; Benj. on Sales, section 623.''

In 35 Cyc. 388, it is said:

''A direct and positive affirmation that an animal is sound amounts to a warranty of soundness, and so, too, does an affirmation that the animal is 'all right.' But a warranty of soundness cannot be predicated on a statement that the animal is a 'good one,' or upon a statement that is expressed merely as a matter of judgment, opinion, or belief.''

Numerous cases are cited by the authors of Cyc. and also in the brief of complainant to sustain this proposition, but we do not deem it necessary to further discuss this question. It is difficult to see how plainer or simpler language could have been used to express a warranty than that used in this contract.

It is next insisted that, admitting this to be a warranty, in ordinary cases, it cannot be relied upon in the instant case for the reason that complainant's agent, Prewett, inspected the cotton seed in controversy, and agreed to buy them, and that the surrounding facts and circumstances show that there was no intention to warrant the soundness of said cotton seed, and that the inspection and acceptance of these identical seed waived the warranty.

It is further insisted by the defendant that the statement by the seller that articles are ''good'' or ''sound,'' particularly where the purchaser either in-

spected the article or had an opportunity of inspection, is not a warranty, but a mere statement of an opinion, and that in such cases the doctrine of *caveat emptor* applies.

We do not agree with this insistence, and are of opinion that the law is well settled that in cases of express warranties there is no foundation for the proposition relied upon, and this is more especially true where anything remained to be done in the future, as in the instant case. This contract clearly shows that no particular cotton seed were embraced in its terms, and that the cotton seed were to be delivered in future, and be good sound cotton seed when loaded out, and were to be weighed and accepted by a representative of the buyer. Had this identical cotton seed in question been destroyed, it is clear that the loss would have fallen upon defendant, and not upon complainant. On December 22, 1913, it was not definitely known that defendant had as much as five hundred tons of cotton seed, including Whit Wilkinson's seed. It is admitted that Prewett did not see part of Wilkinson's seed, which were some distance away, and that what Prewett is claimed to have seen and inspected did not amount to five hundred tons. The seed in question were in several houses, and it is claimed that complainant's agent, Prewett, had holes dug several feet in depth in several places, and expressed his satisfaction with said seed, and that he later dictated the contract.

The authorities all hold that as to latent defects the buyer may take and enforce an express warranty, notwithstanding the fact that he may have personally examined the goods.

2. Mechem on Sales, section 1275, enunciates this doctrine as follows:

"Closely allied to the question discussed in the preceding section is that of the right of the purchaser to take and avail himself of an express warranty, notwithstanding an inspection of the goods. He cannot, of course, within the rules last stated, rely upon a warranty against such defects as are clearly obvious; but as to such defects as may be latent there is now no question that he may take and enforce an express warranty, notwithstanding the fact that he may have personally examined the goods. As stated in a recent case, 'a purchaser of an article may examine it for himself and exercise his own judgment upon it, and at the same time may protect himself by taking a warranty.' "

This same doctrine is stated in *Keely* v. *Turbeville,* 11 Lea (79 Tenn.), 339.

It is also stated in 35 Cyc., 378, as follows:

"Where there is an express warranty, the buyer is under no obligation to inspect or examine the goods purchased but may rely on the warranty. The main purpose of a warranty is often to excuse examination and render examination unnecessary. And even if the buyer does make an examination of the goods, this does not necessarily do away with the effect of

the warranty. A purchaser may examine the goods and exercise his own judgment, and at the same time may protect himself by taking a warranty''—citing numerous authorities.

Learned counsel of defendant rely upon *Barnard* v. *Kellogg,* 10 Wall., 388, 29 L. Ed., 989, and other cases to support his contention.

In *Barnard* v. *Kellogg,* supra, there was no express warranty, written or verbal. The court below found as matter of fact that there was a custom of merchants and dealers in foreign wool in bales in Boston and New York that there is an implied warranty of the seller to the purchaser that the wool is not falsely nor deceitfully packed, and held as a matter of law that said custom was binding on the parties, and gave judgment accordingly.

The principle settled in the Barnard Case is stated as follows:

"No principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of *caveat emptor* applies. Such a rule, requiring the purchaser to take care of his own interests, has been found best adapted to the wants of trade in the business transactions of life; and there is no hardship in it, because if the pur-

chaser distrusts his judgment he can require of the seller a warranty that the quality or condition of the goods he desires to buy corresponds with the sample exhibited.''

The case of *Kellogg Bridge Company* v. *Hamilton*, 110 U. S., 108, 3 Sup. Ct., 537, 28 L. Ed., 86, was likewise one in which a case of implied warranty was involved, and the court sustained the contention that there was an implied warranty. The facts of that case and the holding of the court are briefly stated in the syllabus, as follows:

''A bridge company, having partially executed a contract for the construction of a bridge, entered into a written agreement with a person whereby the latter undertook, for a named sum and within a specified time, to complete its erection. The subcontractor agreed to assume and pay for all work done and material furnished up to that time by the company. Assuming this work to have been sufficient for the purposes for which it was designed, the subcontractor proceeded with his undertaking; but the insufficiency of the work previously done by the company was disclosed during the progress of the erection of the bridge. No statement or representation was made by the company as to the quality of the work it had done. Its insufficiency, however, was not apparent upon inspection, and could not have been discovered by the subcontractor until actually tested during the erection of the bridge. Held, that the law implied a warranty that the work sold or transferred to the

subcontractor was reasonably sufficient for the purposes for which the company knew it was designed."

Williston on Sales, pp. 311, 312, and 30 Am. & Eng. Ency. (2 Ed.), 146, cited by counsel for defendant are not authorities against complainant, but are directly in point, as we construe them, and when properly understood establish complainant's contention.

In Williston on Sales, supra, it is said:

"It is enough here to call attention to the fact that inspection is not held anywhere necessarily to destroy a promise or warranty created by a bargain previously made. But where inspection is had or may be had at the time the bargain itself is made, the tendency in this country seems to be to hold that, at least in the absence of guilty knowledge on the part of the seller, the inspection precludes the existence of any implied warranty, regardless of whether the defect is latent."

In 30 Am. & Eng. Ency. (2 Ed.), 146, 147, it is said:

"While the fact that the buyer had an opportunity to examine the goods sold is not material, when there is a specific warranty covering the defect complained of, it is a circumstance to be considered in determining whether representations made during the negotiations constitute a warranty or were merely words of commendation. Where abundant opportunity to examine and inspect the goods before the sale is afforded to the buyer, the maxim of *caveat emptor* will

be applied as to all defects which a reasonable inspection would have disclosed, and he assumes the risk of such defects unless they are covered by clear and express warranties.''

It will thus be seen that these authorities deal with implied warranties, and that they can in the very nature of things have no application where there is an express warranty. The doctrine of *caveat emptor* does not apply, of course, except in the absence of an express or implied warranty.

Benjamin on Sales, section 965, says:

''The maxim of the common law, *caveat emptor,* is the general rule applicable to sales, so far as quality is concerned. The buyer, in the absence of fraud, purchases at his own risk, unless the seller has given an express warranty, or unless a warranty be implied from the nature and circumstances of the sale. . . . .''

Now, as to the question of fact, as to whether the cotton seed in question came up to the warranty and were accepted by complainant on December 22, 1913, or later: Having held that the written contract governs, and that the title to the cotton seed then on hand did not pass to complainant, and that the language of said contract constituted a warranty, and that the inspection made by Prewett on the day the contract was made does not preclude complainant from relying on the warranty, the only question left for solution is whether defendant breached said contract. It is not disputed that on December 31,

1913, defendant wrote complainant a letter stating that it would have to begin loading the seed as early as January 5, 1914, and asking complainant to have a representative at Somerville on that date; that after several letters passed between them it was finally agreed that complainant would send a repre- sentative, and that on January 12th Mr. Ford was sent, and did inspect all of the cotton seed that were loaded, and declined to accept the seed because, as he claimed, said seed did not come up to the warranty in the contract. Mr. Ford took samples of six cars of cotton seed loaded by defendant for complainant back to Memphis, and complainant wrote defendant January 13th, inclosing what purports to be a copy of a telegram on the same subject, giving the result of Mr. Ford's inspection of the six loaded cars, and averring that the seed tendered were not up to the warranty, and demanding that defendant furnish five hundred tons of good sound cotton seed to fill said contract. On January 13th defendant wrote complain- ant a letter, acknowledging receipt of the telegram and insisting that the cotton seed in controversy were the same seed which complainant's represen- tative had seen and contracted to buy on December 22d, and that the condition and grade of said seed were the same as when they were contracted for— and also stated that defendant was going to sell the cotton seed and move them out right away, and if they did sell said seed at a loss it would hold com- plainant for said loss.

On January 15, 1914, Messrs. Boyd, Prewett, and Yeager, officers and agents of complainant, went to Somerville and inspected the cotton seed loaded on cars and in the warehouses and sheds belonging to defendant, and most of the Wilkinson seed, and made a written report showing fully what condition they claimed said cotton seed to be in at that time. This report showed said seed to be from twenty per cent. to eighty-six per cent. hot, rotten, and black, and, of course, not up to the warranty. Demand was made for the delivery of five hundred tons of good sound cotton seed under the contract. It is also claimed that defendant had sold all of said seed on January 15th; but this is not important now, in view of the fact that complainant's agent had rejected said seed on January 12th.

On January 15th complainant also wrote a letter to defendant, again demanding that it deliver five hundred tons of good sound cotton seed under said contract, and notifying it, if it should fail to do so, complainant would go into the open market and buy at defendant's expense cotton seed of that quality at the market price.

Defendant made no further effort to fill said contract, claiming that complainant had breached same, and in a day or so sold the seed in controversy to the Memphis Cotton Oil Company at the price of $25.50 per ton.

Complainant bought five hundred tons of cotton seed after this in the open market of the kind called

for at the price of $27.50 per ton, to answer its requirements, thus causing a loss of $750, for which this suit is brought.

There is conflict in the evidence as to what was said and done by Prewett; but, as we understand the facts, there is not any very serious dispute as to the fact that the seed were not good sound seed, as called for in the written contract.

Disregarding all the interested witnesses on this point, and looking alone to the testimony of Mr. Knox, agent of the Memphis Cotton Oil Company, the purchaser of the seed, who was introduced as a witness by defendant, it is apparent that said seed were not good sound seed. He says these seed had laid there too long, and that they should have been shipped in December; that they sold for $25.50 per ton, and that the best seed were then selling for more, and that he would not call the seed in controversy first class. The weight of all the testimony in the case preponderates in favor of complainant on this point. There is no serious controversy as to the amount of the damages, if complainant is entitled to recover.

Upon the whole case we are satisfied that the decree of the chancellor is correct, and that there is error in the decision of the court of civil appeals. The writ is therefore granted, and the decree of the court of civil appeals is reversed, and that of the chancellor affirmed.