WALLACE *et al. v.* McCAMPBELL.

(*Knoxville,* September Term, 1941.)

Opinion filed November 29, 1941.

W. H. H. Southern, of Knoxville, for plaintiffs in error.

W. P. O'Neil, of Knoxville, for defendant in error.

Mr. Justice McKinney delivered the opinion of the Court.

This suit was begun in the General Sessions Court at Knoxville by H. B. McCampbell against B. L. and Harry Wallace, executors of R. L. Wallace, to recover $137.50, the price of a Marvel Homogenizer which McCampbell sold R. L. Wallace in the spring of 1938. The suit was defended upon the ground that there was a breach of warranty in that the machine would not do the work for which it was purchased. It is conceded that the machine was defective and was tendered back to McCampbell, but he declined to receive it. This particular machine was manufactured to be used in the pasteurizing and breaking up of the molecules of milk in its preparation for freezing into ice cream.

The parties will be referred to as plaintiff and defendants as they appeared in the trial court.

The General Sessions Court entered a judgment in favor of plaintiff for $137.50. Upon appeal, the Circuit Court affirmed the judgment of the General Sessions

Court. The case was then carried to the Court of Appeals, where the judgments of the other courts were reversed and the suit dismissed upon the ground of an express warranty which was breached. The case came to this court on petition for writ of *certiorari*, which has heretofore been granted and argument heard.

Plaintiff is a merchant in Knoxville who handles hardware and dairy supplies. R. L. Wallace was engaged in operating a farm and a dairy, and had been a customer of plaintiff for many years. The machine in question was manufactured by the Homogenizer Corporation, Limited, of Los Angeles, California. Plaintiff had never seen or handled one of these machines and knew nothing about them when he was requested by R. L. Wallace to order one for him.

The attention of Wallace was directed to this machine by a magazine article published in January, 1938. On the eighteenth of that month Wallace wrote direct to the manufacturer requesting its catalogue and cash price, which request it complied with. On February 10, 1938, Wallace wrote the Corporation detailing to it the method by which his dairy was operated and seeking advice as to the use of this machine. The Corporation replied on February 15, 1938, as follows:

"Mr. R. L. Wallace,

"Clinton Highway No. 25 West,

"Knoxville, Tenn.

"Dear Sir:

"After reading your letter of the 10th, we would assume that the Marvel Homogenizer is just what you want to round out your business. From what you say you are producing your own cream with your cows but still have to haul eight miles to get an homogenized mix.

"Pasteurizing milk or cream is nothing more or less than heating it to 142 to 150 degrees and holding it at that for a short time and then cooling it quickly to avoid bacteria as much as possible. With the Marvel Homogenizer the cream is heated to a pasteurized temperature and then run thru the Homogenizer and cooled. All in one process and at one time. The cream must be heated to go thru the homogenizing process. In other words you can heat your cream and other ingredients that go into the ice cream mix, pass thru the Homogenizer and into the cooler, let it 'set' in the ice box for 24 hours and you are ready to freeze. All in one simple process.

"The homogenization is what produces the fine smooth cream and prevents the cream from churning in the freezer and give you the overrun. You will find that this will give you a much better cream than you can possibly buy.

"If you are selling as much as 100 gallons of cream per day, that means 50 gallons of mix and a Marvel outfit would surely pay you dividends. The mere fact that you save the time and money on not having to haul that eight miles is something.

"If you have facilities for heating from ten to 25 gallons of mix, you would need only the Marvel Homogenizer, if not you would find the Ice Cream Unit just the thing and a great convenience and time saver. The question of heat might be taken into consideration. If you have natural gas or an oil burner or electricity, either one will do.

"We will be glad to sell you on terms of $50.00 down and $22.50 a month for four months on the Marvel Homogenizer and $100.00 down and six monthly payments on the unit. The monthly payments would depend on the

type and size ordered. We also supply formulas for making the cream or you can use your own with equal success.

"We would be pleased to receive your order and can make prompt shipment and if there is any additional information that you desire, write us.

    "Very truly yours,

     "Homogenizer Corporation, Ltd.,

      "By Jas. D. Shaw."

Some time after receiving this letter Wallace decided that he wanted one of these machines and, preferring to purchase through a local merchant rather than direct from the manufacturer, submitted his correspondence with the Corporation, as well as its literature, to plaintiff with a request that he order a machine for him. Plaintiff thereupon wrote the Corporation on April 5, 1938, as follows:

"Homogenizer Corporation, Ltd.

"771 No. Virgil Ave.

"Los Angeles, Calif.

"Dear Sirs:

"I see your add on a complete Mix Maker, Pasteurizer, Homogenizer & Cooler. Also dealer proposition.

"Would like to get full description, cut, and prices to me. Do you guarantee satisfaction or is there a plant near Knoxville we could see.

    "Yours truly

      "H. B. McCampbell"

This letter was answered on April 12th in which the Corporation stated the jobber's discount to be 40 per cent on the Homogenizer and 33⅓ per cent on the Units, terms cash or sight draft attached. On April 22, 1938, plaintiff directed the Corporation to ship him "1 only 25 Gal. Pasteurizer Marvel Mix Unit gravity type at $315.00 less 33⅓%."

In response to this order the Corporation wrote plaintiff on April 26, 1938, as follows:

"H. B. McCampbell,

"606 Western Ave.,

"Knoxville, Tenn.

"Dear Sir:

"We have your order of the 22nd, for one only 25 gallon Gravity Type Marvel Ice Cream Unit and presume that you are ordering this for Wallace Roadside Market with whom we have had some correspondence. If we are in error regarding this, you can no doubt sell Mr. Wallace one. He is on Clinton Highway #25 West.

"Please understand that the machine will be perfectly satisfactory for the use of natural cream.

"Kindly advise if your customer has gas heat available as he is in the country. If not he will have to obtain tank gas. All our standard machines are made to use gas heat of some kind. This is important where machines are sold in the country.

"We do not understand your question regarding 'what size boiler antd what size electric heater.' Kindly advise just what you mean. The Marvel Unit has no 'boiler' unless you refer to the pasteurizer tank. Gas heat under this supplies the heating necessary and an electric motor keeps the liquid in constant agitation to prevent any chance of scorching the mix.

"Upon receipt of this additional information, we will be glad to ship this to you but will require that you send check for $25.00 with order to guarantee freight charges, the balance of $185.00 will be sight draft to bill of lading.

"Kindly let us hear from you by return air mail as

we are booked ahead with orders and can not ship in less than ten days after receipt of order.

"Yours very truly,

"Homogenizer Corporation, Ltd.,

"By Jas. D. Shaw."

Upon receipt of this letter plaintiff sent it to Wallace, after writing at the bottom thereof the following: "Note what this letter says Am afraid you will have to have gas H B McC." Before sending the letter plaintiff cut out the figures $25 and $185.

There is no evidence that Wallace saw any of the correspondence between plaintiff and the Corporation other than this one letter. In that letter the Corporation stated that "the machine will be perfectly satisfactory for the use of natural cream." That machine, however, was never shipped; but on May 16, 1938, plaintiff wired the Corporation as follows: "Ship one only Marvel Homogenizer at once collect." This order was filled and is the machine here involved. The list price of this machine was $140, while that of the 25-gallon Gravity Type Marvel Ice Cream Unit was $315. The record fails to disclose the difference between the two machines.

Conceding, however, that the statement of the Corporation in its letter of April 26th that "the machine will be perfectly satisfactory for the use of natural cream" can be applied to the Marvel Homogenizer, and treating that statement as a warranty, it is the warranty of the Corporation and not that of the plaintiff. The only affirmation by the plaintiff was an opinion that in operating the machine Wallace would have to use gas.

Section 7205 of the Code provides as follows:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural

tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty.''

In 55 C. J., 673, it is said:

''To constitute an express warranty there must be either an express undertaking to warrant in so many words, or, if representations are relied on to make out the warranty, they must be made in such manner and circumstances as to authorize the buyer to understand that the seller intended to be bound by them as a part of the contract of sale, and he must have purchased in reliance on them.''

In *Pemberton* v. *Dean*, 88 Minn., 60, 92 N. W., 478, 479, 60 L. R. A., 311, 97 Am. St. Rep., 503, the Supreme Court of Minnesota defined a warranty as follows: ''A warranty consists in representations and statements of and concerning the condition and quality of personal property, the subject of sale, made by the person making the sale to induce and bring it about.''

Applying these tests to the facts of this case, we find no affirmation or promise by the plaintiff to Wallace as an inducement for him to purchase this machine. Plaintiff never visited Wallace nor solicited him to purchase this machine; while on the other hand Wallace approached plaintiff, enlightened him about this machine, and requested him to order it for him. We are satisfied that Wallace, having fully informed himself about the machine, purchased it on his own judgment and procured it through plaintiff for the reason that by so doing he obtained time in which to pay for it, as his financial

standing with plaintiff was good; and, in addition, he obtained the machine for $137.50, whereas had he ordered it direct from the manufacturer it would have cost him $140.

Whether an affirmation amounts to a warranty or not is a question of the intention of the parties. 55 C. J., 680; *Crescent Cotton Oil Co.* v. *Union Gin & Lumber Co.*, 138 Tenn., 58, 195 S. W. 770. The only affirmation by plaintiff, so far as appears from the record, was "Am afraid you will have to have gas." This was simply an opinion as to the kind of fuel necessary to operate the machine, and cannot be construed as a warranty that the machine would meet the requirements of the purchaser.

The Court of Appeals held that plaintiff, by delivering to Wallace the letter of April 26th, adopted the warranty of the Corporation contained therein. The authorities do not support that view. There must be some affirmation of fact or promise by the seller, the tendency of which induced the buyer to purchase the machine in order to constitute him a warrantor. This record contains no such affirmation or promise.

In *Cool* v. *Fighter*, 239 Mich. 42, 214 N. W., 162, it was held that where a distributor shows a manufacturer's circular containing assertions as to the distance from which a radio receiving set will set up programs, the assertions, if they are to be taken as warranties at all, are warranties of the manufacturer and not of the distributor, notwithstanding that upon inquiry by the purchaser the distributor replied, "They are guaranteed to work; the company stood behind it."

In *Lee* v. *Pauly Motor Truck Co.*, 179 Wis., 139, 190 N. W., 819, it was held that where a manufacturer sold

to a dealer a motor truck on whose engine was stamped a warranty of the capacity of the truck which the dealer resold, the dealer did not by the resale adopt as his own the terms of the warranty.

In *Davis* v. *Iverson,* 5 S. D., 295, 58 N. W. 796, it was held that a bill of sale with the following terms, " 'we have . . . sold . . . one gray Norman stallion . . . free from all encumbrance, and their title to said horse is good, and the above-named horse warranted by his importer . . . to be, with proper care and handling, an average foal getter; and should the above-named horse prove to be barren, a horse of equal size and value to be put in his place,' " is a warranty only of the title and against barronness and the seller does not adopt the importer's warranty that he is an average foal-getter.

The Court of Appeals did not pass upon the question of implied warranty and defendant has not raised it by petition for writ of *certiorari*; hence that matter is not before us.

For the reasons stated herein, the judgment of the the Court of Appeals is reversed and that of the circuit court affirmed.