Daniel **COFFEY** and Sharon Coffey, Plaintiffs,

v.

**DOWLEY MANUFACTURING, INC.,** d/b/a Old Forge Tools; and Goodyear, Defendants.

No. 3:99–0822.

United States District Court, M.D. Tennessee, Nashville Division.

Feb. 19, 2002.

960

Scott Daniel, Melanie S. Lepp, Daniel, Burton and Thomas, Murfreesboro, TN, for Plaintiffs.

Joseph Wheeler, Thomas I. Carlton, Jr., Cornelius & Collins, LLP, Nashville, TN, for Defendants.

## MEMORANDUM

NIXON, Senior District Judge.

Pending before the Court is Defendant Dowley Manufacturing Incorporated's Motion to Exclude Testimony of Plaintiffs' Expert Witness and for Summary Judgment (Doc. No. 46) and Defendant Goodyear's Motion for Summary Judgment and To Exclude Testimony of Plaintiffs' Expert Witness (Doc. No. 52). Both Defendants have now filed a supplement to their original Motions (Doc. Nos.76, 77). Plaintiffs have responded to both the original Motion and the Supplement (Doc. Nos.83, 87), and Defendants have replied (Doc. No. 95). This Court has now had the benefit of a *Daubert* hearing on January 17, 18 and 25, and February 6, 2002, and will exclude the testimony of Plaintiffs' proffered expert for the reasons discussed below. Therefore, as articulated below, summary judgment is appropriate.

## I. BACKGROUND

Daniel Coffey was injured on July 29, 1998, while using an automotive tool known as the Super Hub Shark ("SHS"), manufactured by Defendant Dowley Manufacturing, Incorporated. ("Dowley"). (Stmt. of Facts, at ¶ 1). Coffey's Complaint avers that the bolts securing the cross piece to the arms of the SHS failed and Coffey was knocked backwards when the jaws of the SHS struck his ankles, causing injuries. (*Id.*, at ¶ 2, Compl. at ¶ 7). At the time of his injury, Dowley was employed at Bell Road Tire in Nashville, Tennessee, and was attempting to use a SHS to remove a trapped hub on a 1987 Mercury Topaz. (Coffey Depo., at p. 43). Coffey never used the SHS before the day in question. (Stmt. of Facts, at ¶ 5).

On the day in question, Dowley was attempting to remove the trapped hub from the steering knuckle of the vehicle by using a slide hammer, but was unsuccessful. (Coffey Depo., at p. 35). Coffey employed the SHS at the suggestion of his co-worker, Steve Slowey. (*Id.*, at p. 53). Coffey never received any verbal instructions on how to use the SHS. (Coffey Depo., at p. 37). Although he was aware that the SHS was accompanied by an instruction manual (Stmt. of Facts, at ¶ 8), he did not thoroughly read through the manual, but did flip through the manual to find the section relating to the type of vehicle he was working on. (Coffey Depo., at p. 34). Coffey does not remember exactly how he mounted the SHS (Stmt. of Facts, at ¶ 7), but does recall that he used a half-drive ratchet, approximately sixteen to eighteen inches long to turn the center screw of the SHS. (*Id.*, at ¶ 6). He was also using a "big open box end wrench." (Coffey Depo., at p. 50). However, Coffey does not recall exactly how many turns he made with the tools before the SHS failed. (Stmt. of Facts, at ¶ 10). Coffey claims that the center screw "must have been" placed through the center of the hub, although he does not remember if he did place the screw into the center of the hub. (Coffey Depo., at pp. 44–47). The next

thing Coffey remembers is lying on the floor of the garage, while his co-workers were putting shop towels under his head. Coffey believes that when he came to, he was five or six feet away from where he had been working. (*Id.*, at p. 48). Coffey claims that as a result of this accident, he sustained a knot on his head (*Id.*, at p. 50), a flat mark on one ankle, a bruise on the front of his left ankle (*Id.*, at p. 58–59), and had a pain in his tail bone and behind (*Id.*, at p. 70). Coffey indicates that pieces of the SHS had broken off and ultimately caused the injuries to his legs. (*Id.*, at p. 58). Coffey's co-worker, Tim Coulter indicated that the SHS came apart and he saw Coffey fall back. (Coulter Depo., at p. 7). Another co-worker, Randy Bryson, heard a loud "pop" and saw Coffey fall. (Bryson Depo., at p. 15). Both Bryson and Ryder Gibbs, another co-worker, claim that Coffey had the wheel assembly on the ground, with the SHS attached. (*Id*, at p. 12–13; Gibbs Depo., at p. 8,9). However, another witness, Matthew Stolt reported at his Deposition that the steering knuckle was attached to a vise on the worktable, and the SHS was not attached to the knuckle. (Stolt Depo., at p. 9–10).

Plaintiffs filed this Complaint on July 28, 1999 in state court, and it was later removed to this Court. Sometime in March, 2000, Plaintiffs retained Dr. Dale Wilson as an expert. Dr. Wilson is a professor of mechanical engineering at Tennessee Technological University ("Tennessee Tech") in Cookeville. (Wilson Depo., at pp. 8–9). Dr. Wilson, along with one of the doctoral students at Tennessee Tech, began analyzing the SHS, and ultimately issued his Rule 26 Report on August 18, 2000. Dr. Wilson concluded that " . . . the design of the . . . Super Hub Shark is defective. When the puller is configured for removing hubs and rotors, the tensile and bending loads . . . will cause the small bolts connecting the body and jaws to fail . . . " ((Doc. No. 31, Pl.Exh.D)(August 18,

2000 Rule 26 Report of Wilson)(herein, "Wilson Report I")). In conducting his testing and analysis, Dr. Wilson visually examined the SHS tool and viewed the fractured surfaces of the studs with an optical microscope. (Wilson 1/25/01 Depo., at p. 80). In addition, Dr. Wilson performed a computerized finite element analysis in order to determine the torque that would be required to fracture the stud bolts, assuming that the stud bolts were configured as Coffey asserts they were. (*Id.*, at p. 87). The finite element method calculates nodal displacements, then uses the displacement information to calculate strains and stresses. (Supp. Stmt. of Facts, at ¶ 20).

Defendants submitted the Rule 26 Report of their expert witness, Dr. Donald D. Kinser on April 12, 2001. Defendants moved to exclude Wilson's testimony, and for summary judgment on June 28, 2001.

On July 3, 2001, this Court, upon consideration of the parties' respective positions, ordered Plaintiffs to submit a final (revised) Rule 26 report within thirty days. (Doc. No. 53). Upon finding that the Plaintiffs failed to produce a timely and complete expert witness statement, this Court allowed Plaintiffs to supplement their expert's Rule 26 Report, but also allowed the Defendants to re-depose the Plaintiffs' expert at Plaintiffs' expense. The Plaintiffs submitted Dr. Wilson's final report on August 3, 2001 (Wilson Report II), and the Defendants re-deposed Dr. Wilson on September 20, 2001. Defendants' own expert, Dr. Ronald Kinser evaluated Dr. Wilson's report and findings, and submitted his own Supplemental Rule 26 Report on October 29, 2001.

Dr. Wilson's Rule 26 Report II includes a second finite element analysis. However, Dr. Wilson did not conduct any additional physical testing on the SHS in order to validate the results of his finite element

analysis, although the SHS was returned to Dr. Wilson by the Defendant, per this Court's Order. (Supp. Stmt. of Facts, at ¶¶ 5, 16; Wilson 9/20/01 Depo., at p. 50, 109). Dr. Wilson did not test or obtain an exemplar SHS for examination, yet he asserts that an exemplar SHS was not available at the time. (Wilson 9/30/01 Depo., at p. 34). As support for this contention, Dr. Wilson cites the affidavit of Joel DOWLEY, who asserts that DOWLEY did not have a SHS that was manufactured at or around the same time as the SHS Coffey was using. (J. DOWLEY Affidavit, at p. 3). Dr. Wilson admittedly did not perform additional investigation into the background of the SHS since his January, 2001 deposition. (*Id.*, at ¶ 6). However, Plaintiffs contend that Dr. Wilson did address his earlier faulty assessment and analysis of the loading directional forces involved in the operation of the SHS jaw system, and Dr. Wilson also corrected the incorrect jaw location used in his first finite element model. (*Id.*, at ¶ 8–9; Wilson 9/20/01 Depo., at pp. 48–9). Dr. Wilson also met with Mr. Coffey to assure that Dr. Wilson understood how Coffey was using the SHS at the time of the accident. (Wilson 9/20/01 Depo., at p. 28).

Dr. Wilson and Plaintiffs are now relying on his second finite element modeling analysis. While Dr. Wilson admits that he is only an "experienced user" of the finite element analysis (Wilson 9/20/01 Depo., at p. 54), he contends that he fully comprehends finite element analysis. (Doc. No. 83, Exh. 26, Wilson Supp. Affidavit, at p. 3).

Dr. Wilson's final Rule 26 report includes a calculation for torque and screw force correlation, projecting that 1,920 inch pounds of torque would be sufficient to fracture the steel stud bolts on the SHS tool, assuming a 16 inch distance from the middle of the center screw to the middle of Mr. Coffey's hand, and an applied load of 120 lbs. (Wilson Report II, at p. 16; Wilson 9/20/01 Depo., at p. 83, 85). Dr. Wilson did not conduct a simulation or trial to test his torque generation analysis. (Wilson 9/20/01 Depo., at pp. 91–2).

Defendants maintain that Plaintiffs' Rule 26 Report, as amended, must be excluded for failure to conform with Rule 702 of the Federal Rules of Evidence and Supreme Court case law. Because Dr. Wilson is the sole expert witness as to the alleged defects in the SHS, Defendants argue that once Dr. Wilson's testimony is excluded, Plaintiffs will be unable to make out a cause of action for their claims under Tennessee law. Thus, Defendants assert that they are entitled to summary judgment.

In order to determine whether Dr. Wilson qualifies as an expert witness, this Court found it necessary to hold a discretionary *Daubert* hearing. At the hearing, conducted in late January and early February, 2002, the Court heard from Dr. Wilson, as well as Defense witness Dr. Kinser. Keeping in mind that a *Daubert* hearing is meant to assess the expertise of a proffered witness, the Court focused on the expertise of Dr. Wilson. A *Daubert* hearing is not a battle of the experts, but an opportunity for the parties to debate the expertise of a proffered witness. However, the moving party may utilize its own witness to refute the contentions of the contested expert.

The testimony at the hearing demonstrated that Dr. Wilson is a knowledgeable and experienced engineer, who has analyzed many failures over his career and has relevant experience involving analysis and procedures implicated by this case. The Court is aware that Dr. Wilson previously misconstrued the data in this case, due to the fact that he was mistaken as to the direction of the loads applied to the jaws. However, Dr. Wilson explained at

the hearing that he has since corrected that mistake, and is now confident, to a reasonable degree of technical certainty, that his conclusions are correct. (Tr., at p. 66–67). Dr. Wilson explained at the hearing that some of his past lapses are attributable to a viral illness.[1] However, Dr. Wilson appeared to be capable of discussing his engineering qualifications and explaining the processes he utilized in making his conclusions.

Dr. Wilson discussed his analysis of the SHS failure during his testimony at the *Daubert* hearing. Specifically, Dr. Wilson discussed his second finite element analysis testing, which was conducted by a graduate student under Dr. Wilson's supervision, and testified that he believes, to a reasonable degree of certainty, that the findings contained in his second analysis reflect the nature of the failure of the SHS. Dr. Wilson acknowledged that he assumed certain variables in completing the finite element analysis. In fact, Dr. Wilson acknowledged that he made a "guesstimation" as to the amount of torque generated by Mr. Coffey (and the applied load) (Tr., at p. 80). He also assumed weight and the level length of the wrench Mr. Coffey used. However, Dr. Wilson explained that these assumptions are not fatal to his finite element analysis because they did not ultimately influence the second finite element analysis.

Dr. Wilson also explained that he did not test the SHS or an exemplar because none was available to him. Dr. Wilson also indicated his belief that testing would be fruitless because, due to manufacturing variations, any exemplar SHS or stud would be different from the actual SHS or stud involved in this case. In any event, he stated that testing is rarely done in the failure analysis context. Furthermore, Dr. Wilson noted that this Court instructed him to not conduct any destructive testing in supplementing his original Rule 26 Report. Hence, Dr. Wilson testified that he was forced to rely on finite element analysis, due to the difficulties in obtaining an exemplar SHS and studs, and the problems associated with testing exemplar products in general.

Defense expert Dr. Donald Kinser presented a different hypothesis at the continuation of the *Daubert* hearing on January 25th. Dr. Kinser is a Professor of Mechanical and Materials Engineering at Vanderbilt University, where he has been employed since 1968. Dr. Kinser is a professional engineer in the fields of metallurgy, mechanical and materials engineering, and has provided consultative engineering services to various public and private entities.

Dr. Kinser's testimony and his Rule 26 Report indicate a fundamental disagreement between Dr. Kinser and Dr. Wilson. Dr. Kinser disputes Dr. Wilson's contention that defective design caused the SHS to fail. In fact, Dr. Kinser testified that the failure of the SHS was probably attributable to a previous weakness in the SHS, caused by dropping or hitting the SHS at some point after the SHS left DOWLEY. Dr. Kinser conducted physical testing of the SHS in order to verify or refute Dr. Wilson's theory. Dr. Kinser obtained an exemplar SHS from the Defendants, as well as a 1987 Mercury Topaz steering knuckle assembly similar to the one Mr. Coffey was working on when he was injured. Dr. Kinser testified that he conducted both torque and load testing, and found that it was impossible for Mr. Coffey to produce the amount of torque assumed by Dr. Wilson, and that even if Mr. Coffey

---

1. The condition apparently causes Dr. Wilson to become tired and lose focus, as was the case on January 17, 2002, the first day of the *Daubert* hearing. However, Dr. Wilson appeared capable of testifying when the *Daubert* hearing continued on January 18, 2002.

somehow produced this torque, it still would have been insufficient to cause stud bolt failure.

Furthermore, Dr. Kinser testified that he tested an exemplar SHS and stud bolts to determine whether torque exceeding Dr. Wilson's projections would cause stud bolt failure. Dr. Kinser found that the torque assumed by Dr. Kinser did not result in failure of the exemplar SHS. Additionally, Dr. Kinser testified that his testing of Dr. Wilson's failure load figures did not result in stud damage. In fact, Dr. Kinser testified that the exemplar studs withstood loads in excess of the forces Dr. Wilson assumed. Dr. Kinser even used weaker steel studs and raised the torque to a figure in excess of that assumed by Dr. Wilson, again without stud failure. Further, Dr. Kinser testified that Dr. Wilson's "dynamic loading" theory is also faulty, as demonstrated by Dr. Kinser's testing. In contravention of Dr. Wilson's theory, Dr. Kinser testified that the failure of one stud would *decrease* the pressure on the other stud, not cause it to sympathetically fracture.

Dr. Kinser refuted Dr. Wilson's contentions that exemplar studs and SHS would be irrelevant to the failure of the SHS and studs at issue here. Dr. Kinser opined that an exemplar stud would indeed be relevant to the failure of the original C12L14 steel. Dr. Kinser testified that the C12L14 steel is a standard material that has very specific chemical qualities, and the hardness of the exemplar could be easily tested via a simple hardness test. Therefore, Dr. Kinser concludes that an exemplar stud would be very relevant and

helpful to a determination of what caused the original stud to fail.

Additionally, Dr. Kinser testified to the need for an exemplar SHS, an item he testified was available on the open market.[2] Dr. Kinser contended that without an actual SHS, Dr. Wilson's findings are, at best, based on approximations and projections. Although failure analysis is often used to test hypothetical products, Dr. Kinser stressed that actual testing is preferable when the actual product is available. In fact, Dr. Kinser opined that the use of failure analysis is inappropriate when the actual tool is available.

Although he disputes the validity of Dr. Wilson's very use of bare finite element analysis, Dr. Kinser also refutes Dr. Wilson's finite element analysis findings. First, and most fundamentally, Dr. Kinser testified that Dr. Wilson conducted an inappropriate type of finite element analysis, given the nature of the failure alleged by Plaintiffs. While Plaintiffs allege a plastic failure, Dr. Kinser alleges that Dr. Wilson utilized an elastic finite element analysis. Dr. Kinser testified that an elastic finite element analysis is per se flawed when it is used to analyze a plastic[3] failure, and any results that were obtained using the elastic finite element analysis are not relevant in this case.[4]

Next, even assuming that Dr. Wilson utilized the correct form of finite element analysis, Dr. Kinser disputes his results. Dr. Kinser explained that because Dr. Wilson's input data was erroneous, the results of both finite element analysis tests was "fatally flawed." First, Dr. Kinser

2. It is worth noting that Dr. Kinser obtained his SHS from the Defendants.

3. Elastic refers to the ability of an object to return to its original shape while a plastic deformation refers to that which is permanent or nonrecoverable after release of the applied load.

4. Dr. Wilson maintains that he, in fact, conducted a plastic analysis. However, Dr. Kinser claims that the results of the finite element analysis are inconsistent with a plastic analysis, but could only be the result of an elastic analysis. 2/6/02 Hearing.

stressed that Dr. Wilson did not appreciate the amount of torque generated by Mr. Coffey. While Dr. Wilson "guesstimated" that the torque was 1 foot/lb, Dr. Kinser testified that this is a low figure, and that this amount of torque could be generated by using one's bare hands. Second, Dr. Kinser testified that Dr. Wilson's tensile strength projection of 70–80 KSI for the SHS studs is too low. Dr. Kinser's independent hardness testing revealed that the tensile strength of the exemplar was 110–124 KSI, about twice as much as Dr. Wilson's estimation. Third, Dr. Wilson pointed out Dr. Wilson's geometric modeling errors. Dr. Kinser contended that if an expert does not adequately model an item or system, the resulting analysis would be based on an incorrect or incomplete understanding of that product or system. Fourth, Dr. Kinser disputes Dr. Wilson's contention that stud bolt failure would occur at 500 lbs · of pressure. Dr. Kinser found that the stud bolts did not even fail at 5,000 lbs.

Finally, Dr. Kinser testified to his belief that Mr. Coffey mounted the SHS backwards. Although this is what Mr. Coffey initially described to Dr. Wilson (Wilson Second Depo., Exh. 7), this was later retracted by both Mr. Coffey and Dr. Wilson. (See *Infra*). Dr. Kinser showed pictures to the Court pictures (Pl.Exh.17), which appeared to show that the SHS had markings consistent with the SHS being mounted backwards. Dr. Kinser testified that mounting the SHS backwards was a misuse that did not allow for the hub to be removed at all.

Nevertheless, Dr. Kinser tested the SHS, mounted both correctly and backwards, and his findings convinced him, to a reasonable degree of engineering certainty, that the SHS would not have failed in the way alleged by Mr. Coffey, even mounted backwards. Finally, Dr. Kinser concluded that Dr. Wilson's findings were contrary to the laws of science and engineering and were fundamentally and fatally flawed. (1/25/01 Tr., at p. 95).

The Court will consider the testimony of Dr. Wilson, as well as the rebuttal testimony of Dr. Kinser in making its Rule 702 determination. Although it was not required to hold a *Daubert* hearing, the Court found that the hearing was helpful to its ultimate determination of this issue, as discussed in more detail below.

## II. LEGAL STANDARDS

■ In a diversity action, the law to be applied is the law of the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, the Court will apply Tennessee law to the facts in this case.

### A. Summary Judgment

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c) (West 2001). The Advisory Committee for the Federal Rules has noted that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." All the facts and the reasonable inferences to be drawn from those facts must be viewed in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In order to succeed, "the moving party must show that there is an absence of evidence to support the non-moving party's case," and that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington–South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir.1996). The non-movant, however, may not rely solely

on conclusory allegations in the complaint to defeat a motion for summary judgment, but must come forward with affirmative evidence that establishes each of its claims and raises an issue of genuine material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder to find in favor of the non-moving party. *Id.* at 247–48, 106 S.Ct. 2505. The substantive law involved in the case will underscore which facts are material and only disputes over outcome-determinative facts will bar a grant of summary judgment. *Id.* at 248, 106 S.Ct. 2505.

A movant for summary judgment makes a sufficient showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues to support the non-movant's case. *See Celotex* 477 U.S. at 323, 106 S.Ct. 2548. Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *See id.* at 323, 106 S.Ct. 2548.

The Court must determine whether a reasonable fact finder would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989) (citations omit-

ted). In sum, "[t]he test is whether the party bearing the burden of proof has presented a jury question as to each element of the case." *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir.2000).

**B. *Tennessee Products Liability Law***

 Products liability law in Tennessee is governed by Tennessee Code Annotated § 29–28–105, which provides that "[a] manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." § 105(a). The bare fact that a plaintiff is injured is not proof of a defect in the product. *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn.App. 2000). Instead, a plaintiff "must prove that the product was defective, regardless of the legal theory upon which he relies." *Fulton v. Pfizer Hosp. Prod. Group* 872 S.W.2d 908, 911 (1993). However, if an action is based on express warranty or misrepresentation claims, it is not necessary to prove that the product was defective or unreasonably dangerous. Tenn. Code. Ann. § 29–28–105(c)(2001).

"Unreasonably dangerous" is defined in section 29–28–102(8) as

> ... dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition ...

"Defective condition" is defined in section 29–28–102(2) as "a condition of a prod-

uct that renders it unsafe for normal or anticipatable handling and consumption."

In *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527 (Tenn.1996), the Tennessee Supreme Court found that section 102(8) provides for two distinct tests for discerning the existence of a defective or unreasonably dangerous condition: the consumer expectation test and the prudent manufacturer test.

 Under the consumer expectation test, a plaintiff must produce evidence of the "objective conditions of the product as to which the jury is to employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 805–6 (Tenn.2001) (citation omitted). "This entails a showing by the plaintiff that prolonged use, knowledge, or familiarity of the products' performance by consumer is sufficient to allow consumers to form reasonable expectations of the product's safety." *Id.* at 806. In sum, "[i]f the product is more dangerous than a reasonable consumer would have expected, it is defective." *Tatum v. Cordis Corp.*, 758 F.Supp. 457, 461 (M.D.Tenn.1991). Under this test, a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury. Hence, summary judgment is proper if the undisputed evidence demonstrates that "the danger is obvious to the ordinary consumer." *Curtis v. Universal Match Corp.*, 778 F.Supp. 1421, 1427 (E.D.Tenn.1991).

 By contrast, the prudent manufacturer test imputes knowledge of the condition of the product to the manufacturer. *See generally* Robert P. Murrian, *Products Liability—Tennessee's Prudent Manufacturer Test*, 67 Tenn. L.Rev. 307 (2000). The test is whether, given that knowledge, a prudent manufacturer would market the product. *Ray ex rel Holman*,

925 S.W.2d at 530. "The determination of whether a product is unreasonably dangerous turns on whether, balancing all the relevant factors, a prudent manufacturer would market the product despite its dangerous condition." *Id.* at 532. The focus of the prudent manufacturer test differs from the consumer expectation test, in that the prudent manufacturer test is more applicable to those circumstances in which an ordinary consumer would have no reasonable basis for expectations. Therefore, expert testimony about the prudence of the decision to market would be essential. *Id.*, at 531.

 Regardless of the test utilized by Plaintiff, a defect in a product may be proven by direct evidence, circumstantial evidence, or a combination of both. *Browder v. Pettigrew*, 541 S.W.2d 402 (Tenn. 1976). However, the consumer expectation and prudent manufacturer tests require different levels and methods of proof. Whereas the consumer expectation test can only be applied to products about which an ordinary person would have knowledge, the prudent manufacturer test is applicable to more complex products that an average consumer would have no basis for having any expectation. "For example, ordinary consumers would have a basis for expectation about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel-injection engine or an air bag." *Ray ex rel Holman*, 925 S.W.2d at 531; *see also Whaley v. Rheem Mfg. Co.* 900 S.W.2d 296 (Tenn.App.1995)(finding that expert testimony is necessary to demonstrate defect in heat pump because the "workings of a heat pump are beyond the common knowledge of laymen.").

 Nevertheless, the Tennessee Supreme Court recently held that "the consumer expectation does not depend necessarily on a product's complexity in

technology or use" but, instead, relies on the common knowledge of consumers as to a product's characteristics and performance. *Jackson*, 60 S.W.3d at 805. The Court held that "the consumer expectation test is applicable to any products liability test in which a party seeks to establish that a product is unreasonably dangerous under Tennessee law." *Id.* However, the *Jackson* Court continues to recognize that although the consumer expectation test is technically applicable to all cases, the test may be inadequate in cases involving complex products that are not familiar to ordinary consumers. *Id.* In those situations, the prudent manufacturer test is the sole useful test for assessing a defective or unreasonably dangerous condition. While an expert witness is necessary under the prudent manufacturer test, the consumer expectation test, by definition, relies on the expectations of ordinary consumers, not experts.

In *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 236, 573 P.2d 443 (Cal.1978), the California Supreme Court (Tobriner, Acting C.J.) recognized that " '(i)n many situations ... the consumer would not know what to expect, because he would have no idea how safe the product could be made.' " " *Citing* Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 829 (1973). Therefore, although *Jackson* stands for the proposition that the consumer expectation test is theoretically applicable to all situations, even that Court acknowledged that ordinary consumers would have no expectations regarding certain products and certain failures. 60 S.W.3d at 806 (recognizing the difficulty of using the consumer expectation tests in cases involving complex products).

## C. Breach of Express Warranty

Breach of an express warranty claimants are exempt from the burden of proving defective or unreasonably dangerous conditions under State law. Tenn.Code. Ann. § 29–28–105(a), (c). The claim focuses on whether a product conforms to the manufacturer's express statements about the product, rather than on whether the product is defective or unreasonably dangerous. *Ladd by Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 97 (Tenn.App.1996).

Under the Tennessee Code, breach of express warranty includes:

> (1)(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

Tenn.Code Ann. § 47–2–313 (2001).

An express warranty is dependant upon the party's intention, since no form of words is necessary to create an express warranty. *Crescent Cotton Oil Co. v. Union Gin & Lumber Co.*, 138 Tenn. 58, 195 S.W. 770 (1917). "The essential ingredients of an express warranty are that there must be an affirmation of fact by the seller ... rather than a mere expression of the seller's opinion, belief, judgment or estimate, and that there be a reliance on such affirmation by the purchaser ..." *Agric. Serv. Ass'n, Inc. v. Ferry–Morse Seed Co., Inc.*, 551 F.2d 1057, 1066 (6th Cir.1977) (citations omitted). In order to establish a prima facie claim for breach of express warranty, plaintiff must prove: (1) that seller made an affirmation of fact intending to induce the buyer to purchase the goods; (2) that the buyer was in fact induced by the seller's acts; and (3) that the affirmation of fact was false regardless of the seller's knowledge of the falsity or intention to create a warranty. *H.B.H. Enter., Inc. v. Cates*, No. 03A01–9608–CV–00252, 1997 WL 76804, at * 2 (Tenn.Ct.App.1997).

■ Additionally, in Tennessee, a party must prove four factors in order to prevail on a misrepresentation claim. First, plaintiffs must prove a misrepresentation of material fact made to the public. Second, the representation must pertain to the character and quality of the product. Third, the representation must be false, and fourth, the consumer must justifiably rely upon the false statement. *Ladd,* 939 S.W.2d at 97. Pursuant to Tenn.Code. Ann. § 29–28–106(2), the plaintiffs must show that their injury was proximately caused by the alleged misrepresentation.

### D. *Rule 702 and* Daubert

The admissibility of expert testimony turns on whether the expert is qualified and whether the testimony meets the requirements of Rule 702 of the Federal Rules of Evidence. ("F.R.E."). Rule 702 provides:

> if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case

Fed.R.Evid. 702 (2001). The notes accompanying the 2000 amendments confirm that "[t]he amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed.R.Evid. 702 Advisory Committee Notes (2000).

The Sixth Circuit recently held that "the recent amendment to Rule 702 does not alter the [existing framework] . . . for eval-uating the admissibility of expert testimony . . ." *First Tennessee Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 332 (6th Cir. 2001). The Federal Rules were revised in 2000 to conform to the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court recognized the gatekeeping role of the district court. Specifically, the trial judge must initially determine:

> whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592–93, 113 S.Ct. 2786. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended the *Daubert* analysis to any technical or other specialized knowledge.

■ Although there is no simple test for determining whether a specific methodology is reliable, the *Daubert* court outlined several factors that a district court should consider when exercising its gatekeeper function. *See Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir.2000). Those factors include whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. Thus, a party must show, by a "preponderance of proof," that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual

issues involved in the case. *Id.* at 592, n. 10, 113 S.Ct. 2786.

■■■ However, the test for admissibility is not whether a particular expert "opinion has the best foundation" or even if it is demonstrably correct, but, rather, whether "the particular opinion is based on valid reasoning and reliable terminology." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir.2000) (citations omitted). Although the F.R.E. 702 requirements are treated liberally, " 'that does not mean that a witness is an expert simply because he claims to be.' " *Pride*, 218 F.3d at 577 *citing In Re Paoli R.R Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir.1990). The district court functions as a gatekeeper to determine whether a proffered expert qualifies under Federal Rule 702. In exercising its "gatekeeper" function, a Court need not hold an actual evidentiary/in limine hearing to comply with *Daubert.* *Berry v. Crown Equip. Corp.*, 108 F.Supp.2d 743, 750 (E.D.Mich.2000). However, the Court may find it helpful to do so.

## III. DISCUSSION

This Court must first determine whether, under Tennessee law, the Plaintiffs may only prove their case with the aid of an expert witness. If so, the Court must exercise its gatekeeper function and determine whether Dr. Wilson qualifies as an expert. In order to do this, it is necessary to hold a *Daubert* hearing, as discussed below. After determining whether the Plaintiffs require an expert to make out a products liability claim, this Court must assess whether or not Plaintiffs have presented sufficient proof to avert a finding of summary judgment.

### A. The Necessity of an Expert Witness to Prove a Products Liability Claim

While Plaintiffs contend that this is a simple case involving a simple machine, Defendants assert that this is a complex case requiring a Plaintiffs' expert to make out a products liability claim under Tennessee law. For the reasons discussed below, the Court finds that the SHS is a complex machine about which consumers have no basis for an expectation as to safety.

■■■ Tennessee Law, as discussed above, contemplates a court's use of both the consumer expectation and prudent manufacturer tests to determine whether a product is unreasonably dangerous or defective. However, although the Tennessee Supreme Court recently held that the consumer expectation test is theoretically applicable to all products liability cases, *Jackson, supra,* a trial court must assess whether a given product is sufficiently familiar to ordinary consumers in order to determine whether the consumer expectation is actually useful to a plaintiff seeking to make out a products liability claim.

■■■ The Super Hub Shark is a complex product. First, this is not the type of product that implicates the doctrine of *res ipsa loquitor,* as the damage caused by the alleged failure of the SHS does not speak for itself. The Tennessee Supreme Court's ruling in *Browder* does not mandate a different conclusion. In *Browder,* the Tennessee Supreme Court held that Plaintiffs could successfully rely on the doctrine of *res ipsa loquitor* in a case involving the collapse of a wheel support frame on an automobile. Thus, the Court found that Plaintiffs were not required to rely on the testimony of an expert witness, but, instead, could rely on the failure of the wheel support frame itself, combined with circumstantial evidence, to allow the jury to assess whether the automobile dealer was liable for selling a defective product. 541 S.W.2d at 407.

However, the SHS's failure does not speak for itself. In *Jackson*, the Tennessee Supreme Court recognized the consumer expectations test is applicable to technically complex consumer products that are familiar to consumers. *Supra.* The automobile has become a ubiquitous machine in our modern society. Even a technically complex failure may involve a subject about which an ordinary consumer may have an expectation, as discussed in *Browder*. The SHS is both technically complex and unfamiliar to consumers. Not only is the SHS unfamiliar to the ordinary consumers that would ultimately serve as the finders of fact as the jury, the evidence presented to this court indicates that it is unfamiliar to many of the technically proficient professional consumers of automotive repair products. Although Plaintiffs may theoretically utilize the consumer expectations test, *see Jackson*, this court finds that Plaintiffs will be unable to make out a claim for products liability without the use of an expert. This product is simply too complex and too unfamiliar to ordinary consumers to allow Plaintiffs to make out a claim under Tennessee law without an expert witness. *See Fulton*, 872 S.W.2d at 912. (finding that lay people and courts do not have common knowledge in certain technical matters, and therefore expert testimony is sometimes required).

Plaintiff correctly cites the body of law in Tennessee, and correctly concludes that Tennessee courts have generally required expert testimony in cases involving both complex products[5] and complex failures of simple products.[6] However, Plaintiffs' conclusion that this case involves neither a complex product nor a complex failure is incorrect. Plaintiff asserts that the SHS is a relatively simple tool that failed in a simple manner. (Doc. No. 87, at p. 45). However, unlike *Browder*, this is a case that demands credible expert testimony to allow the finder of fact to adequately determine whether the SHS was defective or unreasonably dangerous. This is not a case where "the nature and circumstances of the accident are of a character that there could be no reasonable inference but that the injury complained of was due to defendant[s'] negligence...." *Fulton*, 872 S.W.2d 908, 911 (Tenn.App.1993). To the contrary, this case involves facts and circumstances that point to a variety of possible factors causing Coffey's injuries.

The SHS is certainly an unfamiliar tool to most consumers, including this Court, and the failure Plaintiffs allege is not self-evident. Indeed, the alleged negligence here is hardly as "plain as a fly floating in a bowl of buttermilk" because "neither lay people nor Courts possess reliable common knowledge in such technical matters." *German v. Nichopoulos*, 577 S.W.2d 197 (Tenn.App.1978). The SHS is a complex tool, designed to remove trapped rotors and replace front wheel bearings without removing the steering knuckle. (Doc. No. 83, Exh. 19). The SHS was also a new innovation in the tool manufacturing industry. The failure here is also somewhat complex. The Plaintiffs allege that the two studs holding the SHS's jaws to the body broke, causing an explosive separation that ultimately caused Daniel Coffey to be struck by parts of the SHS and to fall back.

---

5. *See e.g., Harwell v. Am. Med. Sys.*, 803 F.Supp. 1287 (M.D.Tenn.1992)(expert testimony required in case involving penile prosthesis); *Fulton v. Pfizer Hosp. Prod. Group*, 872 S.W.2d 908 (Tenn.App.1993)(expert testimony required in case involving knee implant).

6. *See e.g., Pride v. Bic Corporation*, 54 F.Supp.2d 757 (E.D.Tenn.1998), *aff'd* 218 F.3d 566 (6th Cir.2000)(complex defect in a simple cigarette lighter).

The average lay juror, and even a technically proficient juror, would need expert testimony in order to adequately comprehend and analyze both the SHS and its purported failure. Indeed, the average lay juror would have no reasonable expectation about the failure of the SHS. *Barker, supra.*[7] The facts here do not speak for themselves, and purely circumstantial and lay evidence is insufficient. Thus, under a theory of products liability, in order for the finder of fact to conclude that Defendants' conduct was the cause of Coffey's injuries, Plaintiffs must present expert testimony. *Accord Pride,* 218 F.3d at 580; *Downs v. Perstorp Components, Inc.,* No. 00–5507, 2002 WL 22000, * 4 (6th Cir. Jan.4, 2002).

### B. Breach of Express Warranties and Misrepresentation

■ Plaintiffs assert that Defendants expressly warranted that the SHS was suitable for the purposes intended and free from defects. It is beyond dispute that the Defendants expressly warranted that the SHS was "merchantable, suitable for purposes intended, and free from defects in material, workmanship, design, and title." (Doc. No. 87, Exh. 20). However, it is not clear that Coffey ever read or specifically relied on these affirmations. For that reason alone, the Court finds that no reasonable jury could find that there has been a breach of express warranty.

In addition, there is no dispute of material fact relating to Plaintiffs' misrepresentation claim. First, there is no proof that Defendants made any misrepresentations of a material fact. There is also no proof that any statement was false, and no proof that Plaintiffs relied upon any particular statement. Hence, Plaintiffs cannot make out a prima facie misrepresentation claim,

and this claim must be dismissed as a matter of law.

### C. Daubert *analysis*

In order to survive this summary judgment motion, Plaintiffs must put forth credible expert testimony that would enable the trier of fact to find in their favor. Exclusion under Federal Rule of Evidence 702 is proper where a purported expert witness lacks the requisite expertise in a given case. *See Pride,* 218 F.3d at 578. Thus, the Court will consider both the Plaintiffs' pleadings and Dr. Wilson's testimony at the January 17, 18, 25 and February 6, 2002 *Daubert* hearing to ascertain whether Dr. Wilson qualifies as an expert. If so, the Court will consider whether Dr. Wilson's particular expertise allows the Plaintiffs to survive Defendants' motion for summary judgment.

This Court will consider both Federal Rule 702 and *Daubert* and its progeny in order to determine whether Dr. Wilson qualifies as an expert. Whereas Defendants claim that Dr. Wilson's theories amount to mere speculation, Plaintiffs continue to rely on Dr. Wilson's expert opinions. The Court will next determine, by exercising its "gatekeeper" function, whether Dr. Wilson qualifies as an expert.

■ The first general requirement under Rule 702 is that the witness' testimony must be based on sufficient facts and data. Fed.R.Evid. 702(1). Defendants claim that Dr. Wilson has done nothing to verify or substantiate either the factual or scientific bases for the opinions and conclusions he offers in his Rule 26 Reports. First, Defendants assert that Dr. Wilson continues to assume correct use of the SHS. Second, Defendants claim that Dr. Wilson's torque and force projections are not based upon actual facts, but are simply assumptions

---

7. As discussed above, the California Supreme Court recognized that some products are sufficiently complex so as to preclude consumers from having any expectations, thereby eliminating the usefulness of the consumer expectation test.

made for the purpose of analysis. Most fundamentally, Defendants contend that Dr. Wilson lacks the requisite expertise to properly assess the systems involved in the SHS, or the SHS's operation. Plaintiffs counter that although Dr. Wilson may have been initially confused about the exact use of the SHS, he has since corrected his earlier error, and the Wilson Report II reflects a solid understanding of the use of the SHS, including Mr. Coffey's precise use of the SHS on the day of the incident.

After considering the record and the testimony rendered at the *Daubert* hearing, the Court finds that Dr. Wilson's theories are not based on sufficient facts and data, and that his testimony will therefore not assist the jury in making a factual determination. Admittedly, *Daubert* and the new Rule 702 were "not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Miss.*, 80 F.3d 1074, 1078 (5th Cir.1996). As the Court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595, 113 S.Ct. 2786.

Nevertheless, the evidence submitted and presented to this Court indicates that Dr. Wilson, although an accomplished Professor with a wealth of knowledge, has not presented "expert" opinions in this case. Most significantly, Dr. Wilson's second finite element analysis is based on hypothesized "guesstimations" regarding a number of important variables. For example, Dr. Wilson assumed that Mr. Coffey was using a sixteen-inch wrench and applying a certain amount of torque. Dr. Wilson failed to convince this Court, either through his affidavits, Rule 26 Reports or his *Daubert* hearing testimony, that these assumptions had any grounding in actual physical findings. In fact, Dr. Kinser's testimony disproved some of Dr. Wilson's assumptions. As Dr. Wilson stated at his deposition, "garbage in, garbage out." In other words, if Dr. Wilson assumed certain parameters for his computerized finite element analysis, and those parameters were later proven to be incorrect, then the conclusion reached by the computer model would also be incorrect. This would be true if any of the parameters assumed by Dr. Wilson were incorrect.

The evidence submitted by Defendants and Dr. Kinser convinces this Court that more than one parameter assumed by Dr. Wilson is incorrect. First, Dr. Wilson assumed that Mr. Coffey used the SHS correctly, and the second finite element analysis assumes that the SHS was mounted correctly. However it is far from clear that the SHS was mounted correctly, and Dr. Kinser's testimony points to some speculative evidence that the SHS was, in fact, mounted backwards, as Mr. Coffey initially claimed. Second, Dr. Wilson assumed a lever length of the wrench/ratchet used by Mr. Coffey. This is pure speculation, and there is no clear evidence showing that Mr. Coffey gripped the lever at a point exactly sixteen inches from the center screw.[8] Third, Dr. Wilson assumed a certain applied load by Mr. Coffey. As discussed above, Dr. Kinser's testimony and testing convinced this Court that this assumption is simply incorrect. Hence, Dr. Wilson's analysis was not based on sufficient facts and data; it was based on hypotheses and "guesstimations" that have little grounding in actual physical realities.

---

8. Dr. Wilson testified at the *Daubert* hearing that he estimated that Mr. Coffey was holding an 18 inch wrench two inches from the end. When questioned about his estimation, Dr. Wilson admitted that the lever length estimation would ultimately affect the torque calculations. (Tr., at p. 83).

The second Rule 702 guideline contemplates that the expert's testimony should be the product of reliable principles and methods. Again, Defendants, through their expert, Dr. Kinser, assert that Dr. Wilson's principles and methods are inherently unreliable. Defendants point to Dr. Wilson's initial failure to conduct a functional analysis of the actual SHS tool. Defendants also criticize Dr. Wilson's failure to validate or test his hypotheses or determine if his projections were accurate. In sum, Defendants claim that Dr. Wilson "failed to follow established and acceptable scientific methods in all phases of the work he did, and in formulating his opinions." (Doc. No. 77, at p. 20). In response, Plaintiffs assert that Dr. Wilson based his ultimate findings on reliable scientific analysis, rooted in the scientific method. Specifically, Plaintiffs claim that the steps and elements of Dr. Wilson's failure analysis constitute reliable scientific methodology. In support of this contention, Plaintiffs recite Dr. Wilson's pedigree: a doctorate in mechanical engineering, employment as a professor of mechanical engineering and chair of the mechanical engineering department at Tennessee Technological University for the past sixteen years, and significant work as a consultant in the failure analysis area for the past nineteen years.

Yet, although Dr. Wilson's pedigree is impressive, the Rule 702 and *Daubert* analysis demands that Court not simply take Dr. Wilson's bare assertions as gospel. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)("nothing ... requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43

F.3d 1311, 1319 (*Daubert II*) ("[w]e've been presented with only the experts' qualifications, their conclusions and assurances of reliability. Under *Daubert*, that's not enough."). Indeed, this Court's reliability determination must be based on a deeper analysis of a witness's use of particular methodology, in order to determine whether the witness's testimony is sufficiently reliable to allow the trier of fact to deem their testimony "expert" in this case. *See e.g., Greenwell v. Boatwright*, 184 F.3d 492, 495–96 (6th Cir.1999).

Therefore, this Court must consider Dr. Wilson's actual principles and methods, as presented to it in the Rule 26 Report and at the *Daubert* hearing. After considering Dr. Wilson's use of scientific methods and principles in this case, the Court finds that Dr. Wilson failed to employ reasonable principles and methods in attempting to ascertain the cause of the SHS failure. Again, although the Court finds that Dr. Wilson's analysis is based on questionable methodology, the issue is whether that methodology is sufficiently reliable to allow a reasonable jury to utilize Dr. Wilson's analysis in making its determinations of fact. *See In Re. Paoli R.R. Yard PCB Lit.*, 35 F.3d at 744 (plaintiffs only have to demonstrate by a preponderance of the evidence that the expert's opinions are reliable, but not that the opinions are "correct"). Defendants' concern that junk science will mislead the jury is simply unfounded. The record in this case reflects that Dr. Wilson is an experienced mechanical engineer and professor of engineering. Nevertheless, an individual is not an expert in the abstract; expertise can only be judged within the context of a given case.

In this case, Dr. Wilson did not utilize reliable principles and methods. First, Dr. Wilson defaulted to a finite element analysis after the Plaintiffs were unable to obtain an exemplar SHS.[9] Dr. Kinser testi-

---

9. The Court notes that Dr. Wilson's expertise may have been hindered by the efforts of

fied that actual testing is preferable to finite element analysis. Dr. Wilson testified testing is often not utilized after conducting a finite element analysis. However, a great deal of finite element analysis concerns theoretical models of objects or systems that do not yet exists. Where a product is actually available, actual testing is preferable. While, Dr. Wilson's second finite element analysis was undertaken using accepted engineering procedures, its very use constitutes an unreliable method—the wrong tool for the wrong job.

Additionally, Dr. Kinser testified that the kind of finite element analysis testing conducted by Dr. Wilson, elastic, was not a correct test for the purported plastic failure of the SHS and studs. Thus, although Dr. Wilson is an "experienced user" of finite element analysis, his bare reliance on the conclusions contained in the finite element analysis is insufficient and unreliable. Furthermore, Dr. Kinser testified that Dr. Wilson used an incorrect form of finite element analysis.[10] Lastly, Dr. Wilson relied on a finite element analysis that was the product of a number of "guesstimations" and speculations. Like a house of cards, once those foundations are disproved, the whole analysis collapses. Here, Dr. Wilson's use and reliance upon a faulty finite element analysis constituted a faulty method, based upon faulty principles. Clearly, the scientific method requires a more exacting analysis of this failure.

 Third, Rule 702 counsels that a court undertaking its gatekeeper function should analyze the expert's application of principles and methods to the facts of the case. Here, Defendants claim that since Dr. Wilson's analysis and opinions were based on erroneous factual assumptions and data in the first place, and since he purportedly failed to follow proper scientific methodology, his results were rendered fundamentally flawed. For example, Defendants assert that their expert Dr. Kinser's torque and load analysis shows that Dr. Wilson's torque and load figures resulted in faulty test results. In addition, Defendants claim that Dr. Wilson's failure to test his theories was improper.

Plaintiffs counter that Dr. Wilson applied his scientific training and employed scientific principles and methods to the facts of this case. For example, the Plaintiffs claim that because no individual can determine the exact amount of force that was applied through the center screw at the time of the SHS accident, Dr. Wilson was forced to use his knowledge and experience to select a possible load and torque figure. Plaintiffs also note that it was impossible to test the actual product in this case because that SHS was no longer operational. Plaintiffs assert that they were unable to obtain an exemplar SHS that was manufactured in 1996, the year that the SHS at issue was manufactured. Furthermore, Plaintiffs claim that even if there had been exemplar SHS and studs, testing on the exemplar studs would not have revealed the precise qualities of the original studs and SHS. Dr. Wilson claims that not all 12L14 steel has the same strength, and thus testing only the exemp-

Plaintiffs' counsel. Dr. Wilson may have preferred to test an actual SHS, but the record reflects that this option was apparently not open to him. Although the Defendants may have been less than helpful in obtaining an exemplar SHS, Plaintiffs apparently could have obtained an exemplar on the open market. Kinser Test., 1/25/02 Trans., at p. 30.

10. Again, Dr. Kinser asserts that Dr. Wilson conducted an "elastic" analysis rather than a "plastic" or "elasto-plastic" analysis. Dr. Wilson contends that he utilized an "plastic" finite element analysis. The Court need not definitively resolve this issue because it is satisfied that, no matter what type of finite element analysis Dr. Wilson utilized, the results were flawed.

lar stud would produce a possibly erroneous result. (Wilson Supp. Aff., ¶ 12). Finally, Dr. Wilson asserts in his affidavit that any testing he may have conducted would have been unreliable and irrelevant because he did not know a number of details, such as the strength of the steel studs or the exact location of the SHS jaws on the steering knuckle. (*Id.*, ¶ 14).

The Court finds no merit in Dr. Wilson's excuse for failing to adequately test both his theory that the SHS stud bolts were defective and his theory that the defective stud bolts failed while Mr. Coffey used the SHS to remove a hub. Plaintiffs' argument simply fails the straight face test: of course no two studs are alike, but that does not mean that failure to test can be excused by the inherent variations that are likely to result from the testing of different objects. Plaintiffs' theory, if drawn to its logical conclusion, would preclude much of the scientific experimentation that is regularly undertaken by scientists and engineers everyday. Just because Dr. Wilson could not go back in time and retrieve the *exact* SHS stud bolts or determine the exact amount of force Mr. Coffey applied at the time of the accident does not excuse his failure to test his hypothesis. According to Joel DOWLEY, his company had exemplars available for review. (Joel DOWLEY Aff., at ¶ 5), and even if the Defendants were less than helpful to Plaintiffs, Dr. Kinser testified that he found the SHS on the open market (over the internet) at the February 6, 2002 hearing.

The Court finds that Dr. Wilson did not apply scientifically valid principles and methodology to the facts of this case. Dr. Wilson's methods and procedures, although shaky, were surely something more than a "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. However, *Daubert* also makes clear that "[p]roposed [expert] testimony must be supported by *appropriate* vali-

dation." *Id.* at 591, 113 S.Ct. 2786 (emphasis added). The issue that this Court must determine, therefore, is whether the finite element analysis constitutes appropriate validation. This Court concludes that it does not.

In *Pride,* the Sixth Circuit found that the failure of the proffered Plaintiffs' expert to conduct reliable laboratory testing rendered his testimony inadmissible. Specifically, the expert in that case did not conduct timely laboratory testing to buttress his claim that the explosion of a Bic lighter was caused by a manufacturing defect which resulted in the failure of the lighter to extinguish. 218 F.3d at 578. The *Pride* court emphasized that the witness not only failed to adequately test his hypothesis, but his hypothesis was actually contradicted by the testimony of other witnesses. *Id.* The Court concluded that "the failure of Pride's experts to test their hypothesis in a timely and reliable manner … renders their testimony … inadmissible under *Daubert* and Federal Rules of Evidence 702 and 104." *Id.* Failure to test, although not determinative of a proffered expert's status, is instructive. The Sixth Circuit has found that failure to test a hypothesis may disqualify a witness from testifying as an expert. *See e.g., Smelser v. Norfolk Southern Ry.,* 105 F.3d 299 (6th Cir.1997).

The *Pride* case is instructive. Although Dr. Wilson undertook to validate his hypothesis by using finite element analysis, he did not utilize actual testing to verify the computerized predictions in a real world setting. Where an exemplar SHS was readily available, failure to physically test the SHS or the studs renders Dr. Wilson's application of the principles and methods to the facts of the actual accident unreliable. Bare finite element analysis, even assuming that it was based on correct assumptions and was an appropriate form

of finite element analysis, was not "appropriate validation" in this context. Dr. Kinser demonstrated that Dr. Wilson's hypothesis could be physically tested and verified in the laboratory. Dr. Wilson may very well be an expert in the abstract, but in this case he apparently settled for a convenient form of validation. However, *Daubert* and Rule 702, while not requiring absolute certainty or even a correct result, do require a more demanding approach to scientific evidence.

 The Court is satisfied that, under the guidelines established by *Daubert* and mirrored by F.R.E. 702, Dr. Wilson does not qualify as an expert. In addition to the F.R.E. 702 guidelines discussed above, Dr. Wilson also failed to meet the other relevant general *Daubert* guidelines. First, Dr. Wilson did not test the product. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 ("... a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.").

Second, the Supreme Court opined that the "general acceptance" of a theory can have a bearing on the court's Rule 702 inquiry. Here, Dr. Kinser's testimony regarding the propriety of the use of a finite element analysis indicates, at the very least, that Dr. Wilson's approach in this case is not generally accepted, since finite element analysis is not often used when actual physical testing is an option. Additionally, Dr. Kinser's testimony shows that Dr. Wilson failed to comply with various American Society for Testing and Materials (ASTM) standards.[11] Dr. Wilson is a member of ASTM, and recognized the authoritative nature of the ASTM standards. His failure to comply with ASTM standards belies Dr. Wilson's claim that his theories are generally accepted. Third, as the Court recognized in *Kumho Tire*, that the Court should be concerned with the level of inquiry employed by the proffered expert and compare this with the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. In this case, the *Daubert* hearing has convinced the Court that Dr. Wilson did not employ the level of intellectual rigor that an engineer in the field would have employed, or that even Dr. Wilson would have employed if this work was being conducted for his own research purposes or on behalf of his employer. An expert must not compromise his or her own professional standards when acting as an "expert" in a court of law. Therefore, Dr. Wilson, under any set of factors, does not qualify as an expert in this case.

There may be cases where no witness can be an expert because the Plaintiff does not have a case.[12] While the Court stops short of making that observation about this case, it is worth noting that a witness is naturally constrained by the facts of a case. When faced with foggy facts and an unclear failure, even Albert Einstein might be unable to qualify as an expert witness in a given case. As mentioned above, a court's gatekeeper function is case-specific, and its invalidation of the testimony of a proffered expert is certainly not an indictment of the witness. Dr. Wilson is obvi-

---

11. For example, Dr. Kinser testified that Dr. Wilson failed to comply with, for example, ASTM E 1188–95 (Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Advisor. Paragraph 4.1 counsels the expert to "obtain and preserve physical items as early as possible."), 860–97 ("Standard Practice for Examining and Testing Items that are or may become Involved in Litigation), and 678–98 (Standard Practice for Evaluation of Technical Data"). 1/25/01 Trans., at p. 27.

12. This is a question for a higher Court to resolve.

ously an accomplished engineer, and he has obviously been constrained by the facts of this case and the resources available to him. However, the limitations of a case do not excuse deficiencies in expertise, as defined by Rule 702 and *Daubert* and its progeny.

This case demands a certain type of engineering prowess. "Testimony of engineers may be excluded if it is not particular to the science involved in the case." *Pride v. Bic Corp.*, 54 F.Supp.2d 757, 761 (E.D.Tenn.1998) *aff'd Pride.* Dr. Wilson's knowledge, skill and expertise do not overcome the inherent deficiencies and complex factual and legal circumstances involved in this case. The Court already put Plaintiffs on notice, in July, 2001, that Dr. Wilson's expert testimony was shaky. The Court having already allowed Plaintiffs to supplement Dr. Wilson's expert witness statement, will not do so again. Dr. Wilson's second finite element analysis is not as faulty as his first, but it still fails to pass muster under *Daubert.* Thus, Dr. Wilson may not testify as an expert in this case, and his testimony will be excluded. The Court only holds that Dr. Wilson's testimony is not expert testimony in this case, and therefore excludes that testimony as unreliable and not sufficiently relevant to the ultimate factual findings in this case.

### c. Summary Judgment Holding

Dr. Wilson does not qualify as an expert witness. Therefore, as discussed above, Plaintiffs will not be able to withstand Defendants' Motion for Summary Judgment. The Court finds that summary judgment is appropriate because, without Dr. Wilson's testimony, Plaintiffs are unable to make out their products liability claim and convince a reasonable jury that Defendants are liable.[13]

First, there is insufficient evidence, via Dr. Wilson's report, that the SHS was potentially defective. Plaintiffs must show that this is an incident that would not ordinarily occur without a defect. Taking all of the evidence in the record into account, without Dr. Wilson's testimony, they cannot show this. Although Tennessee Supreme Court's decision in *Jackson* specified that the consumer expectations test applies to all products liability cases, the Court also recognized that some cases involved products and systems about which consumers had no particular expectations. Thus, expert testimony *is* necessary in Tennessee where a complex product or complex failure, beyond the grasp of an ordinary consumer, is alleged. *See Fulton*, 872 S.W.2d at 912. Hence, without Dr. Wilson, Plaintiffs cannot show a reasonable jury that this is an incident that would not ordinary occur without a defect; to do that, they would need an expert witness. Second, there is no testimony that the SHS that reached Coffey and his co-workers was in the same condition as when it was shipped. Although Dr. Kinser's Deposition testimony and affidavit indicate his belief that the SHS was dropped or struck prior to Mr. Coffey's use (Collective Exh. 1, Dr. Kinser Supp. Aff., at p. 13), the Court is not convinced by this speculation. Additionally, the possibility that the SHS was previously dropped or struck does not foreclose the possibility that the SHS failed in the

---

**13.** The Court reaches this conclusion after extensive deliberation. The Court granted the Plaintiffs a second chance to present a valid Rule 26 Report. The Court also held a four-day *Daubert* hearing to assess whether Dr. Wilson qualifies as an expert in this case. Although the striking of Dr. Wilson's testimony results in summary judgment, Plaintiffs have certainly had all inferences drawn in their favor. Plaintiffs that rely on one expert, who himself relies on one questionable type of analysis, run the risk of having their case dismissed on summary judgment.

way that Dr. Wilson and Plaintiffs contend. While Dr. Kinser's theories may cast doubt on Plaintiffs' theories, summary judgment requires more than doubt; it requires that the Defendants show an absence of a material question of fact. *Celotex.* Nevertheless, Plaintiffs also have to respond to Defendants' contentions with credible evidence indicating that there is a material question of fact. However, Plaintiffs cannot do so without Dr. Wilson's expert testimony. Plaintiffs must do more than simply present a metaphysical possibility that the SHS was defective and that this defect proximately caused Coffey's injuries. In any event, there is nothing in the record that shows that the SHS Mr. Coffey was using reached him in the same condition as when it left the factory. Third, without Dr. Wilson's report and affidavit, Plaintiffs will be unable to establish that the defective SHS proximately caused Mr. Coffey's injury while Mr. Coffey was using the tool for its intended purpose, i.e., removing a hub, and his injuries were caused by his use of this product.

Plaintiff admittedly does not simply rely on the fact that there was an accident involving the SHS. *Celotex.* To the contrary, Plaintiff attempts to use expert testimony to explain that the failure of the SHS was caused by a manufacturing defect. However, Plaintiffs' proffered expert witness is not qualified to give expert testimony in this case. As discussed above, without expert testimony, "... no reasonable jury could find for [Plaintiffs] because, under Tennessee law, expert testimony is required to establish liability in cases alleging manufacturing and design defects." *Pride,* 218 F.3d 566; *Fulton, supra. See also Downs, supra.* (Reaffirming that without expert testimony, no reasonable jury could find for Plaintiffs on causation issue in a Tennessee products liability case involving a complex product.); *Chester Valley Coach Works v. Fisher– Price, Inc.,* No. Civ. A 99CV 4197, 2001

WL 1160012, *13 (E.D.Pa., Aug.29, 2001)("without ... expert testimony, Plaintiffs lack sufficient evidence to establish [causation]. There being no genuine issue of material fact on the issue of causation [summary judgment is proper]").

Thus, Plaintiffs are unable to make out their claim under the Tennessee Products Liability Act. Drawing all inferences in favor of the non-movant, *see Matsushita,* the Courts find that Plaintiffs have not proven sufficient facts to allow a reasonable jury to find the Defendants liable under a products liability cause of action. Simply stated, Coffey "cannot produce evidence such that a reasonable jury could find that the [SHS] was defective or unreasonably dangerous." *Tatum v. Cordis Corp.,* 758 F.Supp. 457, 462 (M.D.Tenn.1991)(Wiseman, J.). In other words, Plaintiffs have failed to present a jury question as to each element of the case. *Davis,* 226 F.3d at 511. Thus, the Court will enter judgment as a matter of law against Plaintiffs.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that Dr. Wilson does not qualify as an expert. Hence, the Court will exclude the proffered expert testimony of Dr. Wilson. Without Dr. Wilson's expert testimony, Plaintiffs will be unable to make out a products liability claim under Tennessee law. Plaintiffs are also unable to make out a claim for breach of warranty and misrepresentation. Therefore, the Court will grant Defendants' motion for summary judgment on all grounds asserted by Plaintiffs, pursuant to the accompanying Order.

## *ORDER*

Pending before the Court is Defendant DOWLEY Manufacturing Incorporated's Motion to Exclude Testimony of Plaintiffs'

Expert Witness and for Summary Judgment (Doc. No. 46) and Defendant Goodyear's similar Motion (Doc. No. 52). Both Defendants have filed a supplement to their original Motions (Doc. Nos.76, 77). Plaintiffs have responded to both the original Motion and the Supplement (Doc. Nos.83, 87), and Defendants have replied (Doc. No. 95).

For the reasons articulated in the attached memorandum, the Court hereby STRIKES Dr. Wilson's proffered expert testimony. Absent Dr. Wilson's expert testimony, Plaintiffs will not succeed in making out a claim under Tennessee law. Thus, Defendants' Motion for Summary Judgment is hereby GRANTED with respect to the products liability claim, as well as to Plaintiffs' express warranty and misrepresentation claims. This Suit is therefore DISMISSED.

It is so ORDERED.