Daniel COFFEY and Sharon Coffey, Plaintiffs—Appellants,

v.

DOWLEY MANUFACTURING, INC., d/b/a Old Forge Tools; and Goodyear, Defendants—Appellees.

No. 02–5454.

United States Court of Appeals, Sixth Circuit.

Dec. 18, 2003.

Scott Daniel, Melanie S. Lepp, Daniel, Burton & Eagle, Murfreesboro, TN, for Plaintiffs–Appellants.

Joseph R. Wheeler, Thomas I. Carlton, Jr., Cornelius & Collins, Nashville, TN, for Defendants–Appellees.

Before MERRITT, DAUGHTREY and GIBBONS, Circuit Judges.

MERRITT, Circuit Judge.

The district court dismissed this products liability case due to the requirement for expert testimony in order for the fact finder to understand the case and the inadmissibility of the expert testimony offered by the plaintiffs. For the reasons stated below, we affirm the district court's opinion.

## FACTS AND PROCEDURAL HISTORY

On July 29, 1998, plaintiff-appellant Daniel Coffey was injured while using an automotive repair tool called the Super Hub Shark manufactured by defendant-appellee Dowley Manufacturing, Inc. Coffey alleges that while he was attempting to use the tool to remove a hub from an automobile, the bolts (referred to by the experts as "studs") securing the "cross piece" to the "arms" failed. This, according to Coffey, caused the "jaws" of the tool to strike his ankles, knocking him backwards and injuring him.

To assist in proving his case, Coffey hired an expert, Dr. Dale Wilson, a professor of mechanical engineering at Tennessee Technological University in Cookeville, Tennessee. Dr. Wilson analyzed the Super Hub Shark and concluded that "the design of the ... [tool] is defective. When the [tool] is configured for removing hubs and rotors, the tensile and bending loads ... will cause the small bolts connecting the body and the jaws to fail." Dr. Wilson used two basic techniques to reach this conclusion. First, he visually examined the Super Hub Shark and viewed the fractured surfaces of the studs with an optical microscope. Second, he used a technique known as finite-element analysis to determine the torque that would be required to fracture the studs, assuming they were configured as Coffey testified. Defendant Dowley Manufacturing hired its own expert witness, Dr. Donald D. Kinser, a professor of mechanical and materials engineering at Vanderbilt University, who disputed Dr. Wilson's methods and conclusions.

Coffey originally filed this products liability action against Dowley in state court, but it was later removed to the United States District Court for the Middle District of Tennessee. A *Daubert* hearing was held before Judge John T. Nixon, who determined that Dr. Wilson's testimony should not be admitted. Judge Nixon then granted summary judgment to Dowley as to all issues. This appeal followed.

## DISCUSSION

█ The district court granted summary judgment on all counts on the grounds that the plaintiff was required to present expert testimony, and that the testimony offered by the plaintiff's expert was inadmissable. We find no error in either ruling.

## I. The Plaintiff Was Required to Present Expert Testimony About the Alleged Defect in the Product

According to Tennessee products liability law, a product is defective if it is in a condition "that renders it unsafe for normal or anticipatable handling and consumption." Tenn.Code Ann. § 29–28–102(2) (2003). Under Tennessee law, there are two acceptable methods of proving the existence of an unreasonably dangerous or defective condition: the "prudent manufacturer test" and the "consumer expectation test." *See Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527 (Tenn.1996). Under the prudent manufacturer test, the court imputes knowledge of the actual condition of the product to the manufacturer and then asks, given that knowledge, whether a prudent manufacturer would market the product. *See Id.* at 530, 532. It is undisputed that expert testimony is essential to a claim based on the prudent manufacturer test. *See Id.* at 531.

However, Coffey argues that the consumer expectation test can be used to evaluate the failure of the tool. Under the consumer expectation test, the plaintiff must put forward evidence of the objective conditions of the product, and the jury will "employ its own sense of whether the product meets ordinary expectations as to. its safety under the circumstances presented by the evidence." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 805–06 (Tenn.2001) (citation omitted). In order to use the consumer expectation test, it must be the case that

> the product's performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, "common" knowledge as to its characteristics. This entails a showing by the plaintiff that prolonged use, knowledge, or familiarity of the product's performance by consumers is sufficient to allow consumers to form reasonable expectations of the product's safety.

*Id.* at 806. As the Tennessee Court of Appeals has noted, "ordinary consumers would have a basis for expectation about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel injection engine or an air bag." *Ray ex rel Holman*, 925 S.W.2d at 531. Here, Coffey is unable to meet this burden. The Super Hub Shark is a complex tool. It is designed to be used for a variety of purposes, many of which involve different configurations, and it includes a number of parts. It is not at all obvious from looking at the tool or even at diagrams showing it in use how it operates, much less how safe it is.

The plaintiffs argue that the district court mischaracterized the relevant population of "consumers." They argue that the consumers who are relevant are those who actually purchase Super Hub Sharks, presumably auto mechanics and technicians. If regular customers of the device would have a reasonable expectation of the product's safety, they posit, the consumer expectation test may be successfully used. Whether this is correct is a difficult question we need not reach. The Super Hub Shark is a new tool, and its complexity makes it unlikely that even the average auto mechanic could have a reasonable expectation of its safety without training. Therefore, even if we limit the universe of consumers to the narrow world of auto mechanics, Coffey is still not entitled to use the consumer expectation test. In or-

der to prevail, Coffey must resort to the prudent manufacturer test, which requires an expert, as the district court concluded.

## II. The Trial Court Properly Excluded Dr. Wilson's Testimony

█ We review a district court's decision to exclude expert testimony for abuse of discretion on *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The court must act as a "gatekeeper" to determine whether a purported expert's testimony is sufficiently relevant and reliable to be submitted to a jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the leading Supreme Court case on point, provides that

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in

issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592–93. Dr. Wilson's testimony fails to meet the standard set forth in Rule 702 and *Daubert.*

First, under Rule 702, the testimony must be based on sufficient facts or data. In this case, Dr. Wilson's testimony was not based on sufficient facts. To test the strength of the studs in question, Dr. Wilson used a technique called finite element analysis. Finite element analysis is a purely analytical technique and does not involve any physical testing. Dr. Wilson's first Rule 26 report was based on a critical error, which he admitted. He applied the loads, the forces, to the jaws of the Super Hub Shark in the wrong direction, assuming that the device would *pull* the hub or bearing off, when in fact it *pushes* the hub or bearing off.[1] This error produced incorrect results, a mistake likely attributable to the fact that Dr. Wilson never obtained a working exemplar tool to examine before performing the finite element analysis. In any event, Dr. Wilson initially claimed that one foot pound of torque applied to the center screw of the tool would generate enough force to cause the failure complained of in this case. In fact, this is wildly inaccurate. One could generate this amount of force with his or her hands, and it is clearly not sufficient to break the bolts. That Dr. Wilson did not immediately recognize this shows his inexperience with the subject matter. He now admits that the results of this first analysis were incorrect and has abandoned them, and also admits that he is not an expert in

---

1. Dr. Wilson's confusion supports not only our conclusion that the district court was correct to strike his testimony, but also our conclusion from the last section that the tool

is complicated enough that expert testimony is required in order to succeed on a products liability claim.

finite element analysis, but merely an experienced user.

Second, Dr. Wilson did not thereafter apply sound principles of failure analysis to this case. Dr. Wilson has not performed any actual physical testing to evaluate the results of his second finite element analysis. He incorrectly contends that this is because a relevant exemplar tool was not available. The defense's expert, Dr. Kinser, was able to obtain a Super Hub Shark for actual physical testing. He got his from the company, but also testified that others were available for sale on the open market, and the defense testified that it made an exemplar available to Dr. Wilson for testing. Dr. Wilson argued that any Super Hub Shark available today would not provide a relevant comparison because Dowley has changed the grade of steel used to make the studs in newer models. However, as Dr. Kinser's experiments demonstrated, exemplar studs could easily be manufactured to any desired specification.

In addition to his failure to test the results of the finite element analysis, Dr. Wilson committed several errors in his analysis which cast doubt on the results. He had to perform torque calculations to determine how much force would have been imposed on the studs. To do so, Dr. Wilson made "guesstimations" with regard to important elements of these calculations. For example, he assumed that the length of the lever being used to turn the center screw and apply force to the studs was 16 inches. The wrench Coffey was using was probably 18 inches long. Dr. Wilson, although he did not ask Coffey to confirm this, surmised that Coffey was probably holding the wrench about two inches from the end. Thus, Wilson used a lever length of 16 inches in his calculations.

Wilson admits that if the lever length entered into the formula was inaccurate, this would make the predictions of the finite element analysis inaccurate.[2] Dr. Wilson also assumed that the load applied to the lever was 120 pounds. This is another guesstimation. Wilson apparently took Coffey's total weight at the time, 160 pounds, and reduced it arbitrarily to 120 pounds. Like the length of the lever, if the load applied to the lever is incorrect, this will adversely affect the accuracy of the calculations. Although the amount of torque a person of Coffey's build could have generated with a wrench like the one Coffey was allegedly using was easily testable, Wilson failed to confirm his assumptions in any way. Based on these assumptions, Wilson predicted that applying a load of 160 foot pounds (which is 160 times greater than his initial opinion of one foot pound) would be sufficient to cause stud failure. The lack of grounds for these estimates, especially when viewed in light of Wilson's complete failure to test his predictions, casts doubt on his results. As Dr. Wilson admitted, "Garbage in. Garbage out."

Dr. Kinser, by contrast, has physically tested examplar studs make of the same grade steel as the studs which failed. Kinser successfully loaded the exemplar studs far beyond the range at which Wilson predicted failure. Even given Dr. Wilson's arbitrary "guesstimations," in these actual tests the studs did not fail, and indeed showed no deformation at all. Wilson admits that it is difficult to reconcile his theoretical projections with Kinser's actual test results. Whereas Wilson's report predicted that the studs would fail at a load of 2,000 to 4,000 pounds, Kinser applied 111 foot pounds of torque and a load of 6,760 pounds, with no resulting deformation of

---

**2.** In addition, there is some indication that an impact wrench may have been used on the tool at some point. This would generate much more torque than a hand wrench. If proven, this would completely invalidate Wilson's predictions.

the exemplar studs. Kinser then conducted further testing with weaker steel, which was about half as strong as the studs which failed. Even though Kinser again applied over 100 foot pounds of torque, these weaker studs did not fail, either. Kinser then put the weaker studs on a lathe and removed steel until they were only about one third of their original strength. Because the steel they were made of was only half as strong as the steel in the original studs, this means that these studs were only about one sixth as strong as the original studs. Kinser applied over one hundred foot pounds of torque, and these studs did not break or bend, either. These real world tests by Kinser demonstrate that Wilson's predictions were flawed. Just as importantly, they show that Wilson could have easily performed actual experiments himself in an effort to confirm the conclusions he reached through finite element analysis.

The record in this case is extremely long and very complex. The shortcomings of Dr. Wilson's technique are not fully outlined above, nor were they fully outlined in the district court opinion disqualifying Dr. Wilson and granting summary judgment. We have mentioned just a few of those shortcomings here, including some of the ways in which his projections were based on data which may not reflect conditions in the real world. Given the failures in Dr. Wilson's analysis, the arbitrariness of his "guesstimations," and his failure to do actual testing which he could have accomplished with relative ease, the district court did not abuse its discretion when it refused to allow his testimony as an expert.

## III. The Plaintiffs' Express Warranty, Misrepresentation, and Failure to Warn Claims Were Also Properly Dismissed

The district court was correct to dismiss the plaintiffs' express warranty and misrepresentation claims. Both claims require proof of actual reliance by the plaintiff. *Tatum v. Cordis Corp.*, 758 F.Supp. 457, 463–64 (M.D.Tenn.1991) (express warranty); *Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 101 (Tenn.Ct.App.1996) (misrepresentation). The record supports the district court's finding that there was no proof of actual reliance in this case. Likewise, the failure to warn claim was also properly dismissed. Proof of proximate causation is an essential element of every product liability claim, including claims based on a failure to warn. *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). In this case, as already discussed, expert testimony was required in order to establish that a defect in the tool caused Mr. Coffey's injuries.

For the foregoing reasons, the district court's opinion is AFFIRMED.