**ELLIPSIS, INC., Plaintiff,**

v.

**THE COLOR WORKS, INC., Defendant.**

**The Color Works, Inc., Third–Party Plaintiff,**

v.

**Mary Elizabeth Wade, a/k/a Elizabeth Wade, individually, Third–Party Defendant.**

No. 03–2939 BV.

United States District Court, W.D. Tennessee, Western Division.

Jan. 26, 2006.

James G. Sammataro and Merrick L. Gross of Akerman Senterfitt, Miami, FL; Danny Van Horn of Butler Snow, O'Mara, Stevens & Cannada, PLLC, Memphis, TN, for TCW.

Ken Shuttleworth of Shuttleworth Williams, PLLC, Memphis, TN, for Ellipsis and Ms. Wade.

## ORDER GRANTING DEFENDANT'S DAUBERT–BASED MOTION TO EXCLUDE THE PURPORTED EXPERT TESTIMONY OF EMMONS PATZER AND ALEXANDER IVY

VESCOVO, United States Magistrate Judge.

Before the court is the October 28, 2005 motion of the defendant, The Color Works, Inc. ("TCW"), to exclude the expert testimony of Emmons Patzer and Alexander Ivy, the two experts designated by the plaintiff Ellipsis, Inc. and third-party defendant Mary Elizabeth Wade (collectively "Ellipsis") to testify as to lost profits and damages. Ellipsis opposes the motion. TCW also filed a reply memorandum. The motion was referred to the United States Magistrate Judge for determination. Pursuant to Ellipsis' request, a hearing was held on the motion on December 16, 2005. For the reasons that follow, the motion to exclude the expert testimony of Ellipsis' experts, Emmons Patzer and Alexander Ivy, is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Ellipsis, markets and sells accessories, such as replaceable camouflaged cellular telephone face plates ("camouflaged face plates"). TCW decorates and custom paints electronics and other goods, including camouflaged face plates. TCW was a fully-licensed decorator of proprietary camouflaged patterns owned and licensed by Realtree Inc. In February 2001, Ellipsis terminated its relationship with its prior manufacturer and TCW began manufacturing the camouflaged face plates for Ellipsis. On December 15, 2003, Ellipsis filed this action against TCW alleging fraud, violations of the Tennessee Consumer Protection Act, and tortious interference with business relations, such as failing to produce the camouflaged face plates in the quantities sought by Ellipsis and failing to meet delivery deadlines. Ellipsis alleges that TCW's conduct as described in the complaint caused Ellipsis to lose profits from the sale of camouflaged face plates for the years 2001 through 2003.

### A. *Ellipsis' Experts*

Ellipsis retained Emmons Patzer to determine the amount of camouflaged face plates Ellipsis could have expected to sell, but for TCW's alleged conduct. Patzer received his MBA in marketing and management from the University of Wisconsin, where he studied various methodological approaches that are appropriate for marketing different types of goods. Patzer has had several years of experience in conducting market research concerning a variety of products.

Patzer's lost profits analysis was "similar to the standard market research practice of test marketing a product." (TCW's Daubert–Based Mot. to Exclude the Purported Expert Test. of Emmons Patzer

and Alexander Ivy, Ex. C ("Patzer Report") at 1.) In his analysis, Patzer used preexisting sales data—Ellipsis' sale of 2,218 camouflaged face plates through a single publication in Cabela's Ducks Unlimited catalog with a circulation of 2.5 million—to arrive at a purchase rate of 0.00089 per circulation exposure. (Patzer Report at 5.) Patzer then predicted that 42 million hunters (a statistic found on the Realtree website[1]) and an additional ten percent of the United States population would be interested in purchasing camouflaged face plates. Applying the purchase rate of 0.00089 to this potential purchasing audience, Patzer calculated that 60,995 camouflaged face plates could be sold on a single exposure. (*Id.* at 6–7.) Patzer then determined, based on Ellipsis' sales of camouflaged sunglasses, that sales of the camouflaged face plates would go up over time with increased exposure. Using the yearly percentage increase in Ellipsis' sales of camouflaged sunglasses, Patzer concluded that Ellipsis could have sold 421,008 camouflaged face plates over four years. (*Id.* at 8.)

At the hearing, Patzer explained the methodology he used in his report. For example, Patzer stated that he relied solely on the statistic of 42 million hunters from the Realtree website because it is representative of the people that Realtree believes are interested in camouflage. Patzer also testified that he did not verify the statistic on the Realtree website or read the underlying study because a commercial enterprise has an interest in producing correct information on their websites. With respect to the additional ten percent of the population who would also be interested in camouflaged face plates, Patzer stated that, in his experience, the

purchase rate by "core" purchasers is usually three times that of "non-core" purchasers. Here, the ten percent represents only one-quarter of the core purchasers who are hunters.[2] He admitted, however, that he did not verify the information provided to him by Ellipsis.

Ellipsis also retained Alexander Ivy to estimate Ellipsis' damages from lost profits from 2001 to 2004. Ivy's report is premised on the assumption that the "demand for camouflage cell phone camouflaged face plates has been appropriately estimated by Emmons Patzer." (TCW's Daubert–Based Mot. to Exclude the Purported Expert Test. of Emmons Patzer and Alexander Ivy, Ex. D at 1.) Both Ellipsis and TCW agree that Ivy's report is therefore predicated on Patzer's findings and its admissibility is dependent on the admissibility of Patzer's report.

## B. *TCW's Expert*

TCW retained Dr. Richard Bergin of Navigant Consulting, Inc., to review and comment on Patzer's conclusions. Bergin received his MBA and Ph.D. from Harvard Business School, where he studied market forecasting methodologies. Bergin has experience in conducting market projections for hard goods, including electronic products like cell phones. At the hearing, counsel for Ellipsis did not challenge Bergin's qualifications.

Bergin noted several flaws in Patzer's report, which TCW discussed at length in its memoranda and at the December 16, 2005 hearing: (1) Patzer did not verify the statistic from the Realtree website that there are 42 million hunters and did not read the underlying study cited by Realtree, and therefore vastly overstated the

---

1. Patzer notes in his report that Realtree specializes in supplying manufacturers with camouflage patterns. (*Id.* at 6.)

2. This assertion is not supported by Patzer's report, which states that 42 million hunters is equivalent to about fifteen percent of the United States population. (Patzer Report at 7.)

presumed market for camouflaged face plates by double counting hunters who also engage in other shooting sports and by including age inappropriate hunters and infrequent hunters; (2) Patzer made a baseless claim that an additional ten percent of the United States population may also purchase camouflaged face plates and made no attempt to assess the reasonableness of that claim; (3) Patzer did not establish an appropriate damages period because he did not know the alleged damages period, he did not know the date of publication of the Cabela's Ducks Unlimited catalog, and he did not assign specific years to his calculation of lost sales; (4) Patzer should not have based his purchase rate on the Cabela's Ducks Unlimited catalog because Ellipsis did not sell as many camouflaged face plates in other catalogs, Cabela's had purchased the camouflaged face plates from Ellipsis and was only able to sell about half of those it had purchased, and the camouflaged face plates had Ducks Unlimited logos on them which could have increased sales of the camouflaged face plates by Cabela's; (5) Patzer misapplied the sales rate because he used sales from a fall 2004 catalog and extrapolated the purchase rate forward, whereas TCW's alleged acts took place in 2002–2003, and because Patzer applied the same sales rate to hunters and non-hunters; (6) Patzer's growth rate of sales is unsupported and based on the flawed hypothesis that the growth rate will mirror that of camouflaged sunglasses; (7) Patzer ignored relevant market forces, such as the fact that camouflaged face plates were a fad, Ellipsis' exclusive distribution rights with Realtree expired, and competitive camouflage patterns manufactured by entities other than Realtree entered the market; (8) Patzer failed to authenticate his methodology and cited an article about consumable goods, which are distinguishable from hard goods like camouflaged face plates; and (9) Patzer did not independently verify any of the information provided to him by Ellipsis.[3]

Bergin performed two calculations of Ellipsis' lost sales himself. First, Bergin calculated Ellipsis' lost sales using Patzer's modified test market analysis, but correcting the flaws summarized above.[4] Bergin testified at the hearing that, because the method Patzer used is so simple, it is "critical" that the numbers used are correct. Bergin's calculation reduced Patzer's calculation of total lost sales from 421,008 camouflaged face plates to a mere 16,672. (Bergin Report at 3.) Bergin then calculated Ellipsis' lost sales using an historical sales data method, an alternative methodology that Bergin testified at the hearing was preferable to the one used by Patzer. Using historical sales data, Bergin concluded that the maximum lost unit sales attributable to TCW would be 4,688 camouflaged face plates. (*Id.* at 4, 38–45.)

Bergin concluded that Patzer's report is "unreliable and wholly inadequate to sustain his opinion on Ellipsis' lost unit sales of camouflaged face plates." (Notice of Filing the Rebuttal Expert Reports of Navigant Consulting and Southard Financial, Ex. 2 ("Bergin Report") at 1.)

## ANALYSIS

In its motion to exclude Patzer and Ivy's testimony currently before the court, TCW argues that Patzer's expert testimony

---

3. This included information such as the number of camouflaged face plates sold in the Cabela's Ducks Unlimited catalog, the circulation of that catalog, and the number of camouflaged sunglasses sold.

4. At the hearing, Bergin testified that Patzer did not conduct an actual "test market" analysis because test markets are used for new and novel products and should be designed by the researcher in order to eliminate bias and to ensure that the test market is appropriate.

should be excluded because Patzer does not qualify as an expert in this case and because the methodology and data employed by Patzer are so unreliable so as to render his testimony inadmissible. Ellipsis counters that Patzer is qualified to testify as an expert. Ellipsis insists that Patzer's testimony is admissible because his "test market" methodology is reliable and because the sources and facts he relied upon go to the credibility, not the admissibility, of his testimony and are subject to cross-examination at trial.

■ Rule 702 of the Federal Rules of Evidence, as discussed and interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), controls the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Thus, expert testimony may only be admitted into evidence if: (1) the witness qualifies as an expert; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Id.; Daubert*, 509 U.S. at 589–91, 113 S.Ct. 2786.

In *Daubert*, the Supreme Court held that Rule 702 imposes a "gatekeeping"

obligation on the trial court to ensure expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. This "gatekeeping" function applies not only to scientific testimony but also to testimony regarding technical or other specialized knowledge. *Kumho*, 526 U.S. at 141, 119 S.Ct. 1167.

■ Essentially, *Daubert* and *Kumho* require a two-step inquiry that involves an analysis of the "relevance and the reliability" of an expert's opinion. *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999). The relevance step of the inquiry is designed to ensure that "there is a 'fit' between the testimony and the issue to be resolved by the trial." *Id.* (citing *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993)). The reliability step focuses on the "methodology and principles" that form the basis for the testimony. *Id.* A trial court must inquire as to whether the methodology underlying the proffered expert testimony is valid and whether the methodology may be properly applied to the facts at issue in a particular case. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.

■ *Daubert* sets forth five factors the court may consider to determine reliability: (1) whether the expert's technique or theory can be and has been tested, (2) whether the technique or theory has been subjected to peer review and publication, (3) the known or potential rate of error of the technique when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory is generally accepted in the scientific community. *Id.* at 593–94, 113 S.Ct. 2786. The court's inquiry under *Daubert* is flexible. *Id.* at 594, 113 S.Ct. 2786. These factors are not a definitive test or checklist but are merely instructive. *Id.* at 593, 113 S.Ct. 2786; *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167.

A. *Whether Patzer Qualifies As An Expert*

Pursuant to Rule 702, a witness may offer expert testimony only if he or she is "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702. To qualify as an expert, the witness' knowledge, skill, experience, training or education must be closely related to the subject matter of his testimony. *See Faircloth v. Lamb–Grays Harbor Co. Inc.*, 467 F.2d 685, 694 (5th Cir.1972) ("To warrant or permit the use of expert testimony ... the subject matter must be closely related to a particular profession, business or science ....."); *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1357 (D.Ariz.1996) ("Expertise in the technology of fruit is not sufficient when analyzing the science of apples.").

TCW argues that Patzer does not qualify as an expert in this case because he has no experience with camouflaged cell phone face plates or knowledge of the market for such camouflaged face plates. TCW points out that Patzer's degrees were in chemistry, industrial tract nutrition, and nutritional science, and his work experience has been limited to pharmaceuticals, managed care, nutrition and over-the-counter consumer nutritional products. TCW further argues that Patzer is not qualified as an expert because all of the market projections conducted by Patzer related to consumable goods and that consumable goods, such as cereal, are significantly different than hard goods, such as the camouflaged face plates at issue here.

To support its argument that Patzer is not an expert in market projections related to hard goods, TCW analogizes to cases in which the court found that an expert in biomechanics was not qualified to render a medical opinion and a mechanical engineer was not qualified to testify on car design. *See Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 305 (6th Cir.1997); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir.1979). TCW also argues that Patzer should not qualify as an expert because his report does not distinguish between consumable and hard goods and, in fact, employs a formula that is limited to consumable goods when projecting the market for camouflaged face plates.

Ellipsis responds that to disqualify Patzer because he does not have specific experience with hard goods "would be equivalent to disqualifying a car wreck reconstructionist because he/she had only reviewed car wrecks and not wrecks involving trucks." (Ellipsis' Resp. Mem. of Law to TCW's Daubert–Based Mot. to Exclude the Purported Expert Test. of Emmons Patzer and Alexander Ivy and Request for Daubert Hr'g at 5.) Ellipsis maintains that Patzer is qualified as an expert in this case because he has an extensive background in marketing and sales and because he has conducted market projections for many products. Ellipsis therefore asserts that Patzer is qualified to testify on all consumer goods, including camouflaged face plates.

The court is not convinced that the disparity between market projections for consumable goods and market projections for hard goods is so great that a witness with extensive experience in one could not qualify as an expert in a case involving the other. Furthermore, the disparity that exists is not comparable to the cases cited by TCW, where an expert in bio-mechanics sought to render a medical opinion and a mechanical engineer sought to testify on car design. Therefore, the court finds Patzer qualified to testify as an expert on the marketability of goods because his expertise and experience sufficiently "fit" the facts of this case.

The court, however, is troubled by the allegation that Patzer failed to account for

the differences between consumable goods and hard goods in his report. As discussed below, the failure to account for such differences combined with the existence of numerous other flaws in Patzer's methodology render his testimony unreliable and therefore inadmissible.

## B. *Whether Patzer's Testimony Is Reliable*

Pursuant to Rule 702 and the "reliability" step of the *Daubert* analysis, the court must also determine whether Patzer's testimony is sufficiently reliable. Rule 702 requires that: "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.

■ TCW argues that Patzer's expert testimony should be excluded because the methodology and data employed by Patzer are unreliable. TCW bases its argument primarily on the nine flaws in Patzer's report identified by Bergin and summarized above. TCW also alleges that Patzer's modified "test market" analysis is not a recognized method of forecasting sales because "test markets" are used for new and novel products and are designed by the researcher to eliminate bias, and here, Patzer used existing sales data and did not specifically design the test market. TCW also notes that, under the *Daubert* factors, Patzer's conclusions have not been tested, Patzer's conclusions have not been published or otherwise subjected to peer review, and there is no scientific technique susceptible to a known error rate.

Ellipsis counters that Patzer's methodology "based on a test market" is sufficiently reliable because it is a "basic model in the field of marketing that has been used numerous time [sic] for market projections." (Ellipsis' Resp. Mem. of Law to TCW's Daubert–Based Mot. to Exclude the Purported Expert Test. of Emmons Patzer and Alexander Ivy and Request for Daubert Hr'g at 2, 7.) Patzer testified that his test market methodology has been used by his peers in the industry for years and has been subject to publication. Ellipsis further insists that the reliability of the underlying data supporting Patzer's opinion generally goes to the weight of his testimony, not its admissibility. Ellipsis notes that TCW can cross-examine Patzer about the underlying data at trial.

It is important to note that the nine flaws cited by TCW relate to both the underlying data and to the methodology and principles that Patzer employed when using such data. For example, at the hearing, Patzer testified that he relied upon the statistic on the Realtree website that there are 42 million hunters in the United States. TCW argues that this statistic is factually inaccurate because the study double counts people who both hunt and participate in other shooting sports and that the use of this number shows that Patzer's methodology is unreliable because he failed to read the underlying study or otherwise confirm the statistic. In addition, TCW claims that Patzer failed to apply the principles and methods of the modified test market reliably to the facts of the case because he did not account for the fact that some of the 42 million hunters were as young as seven years old and were, therefore, unlikely to purchase camouflaged cell phone face plates.

■ When determining whether an expert's testimony is reliable, the court may consider the factual basis for the expert's opinion. Indeed, Rule 702 specifically states that an expert may only testify if "the testimony is based upon sufficient facts and data" and "the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Courts may also review the factual basis

for an expert's testimony under Rule 703 of the Federal Rules of Evidence. Under Rule 703, expert opinions based on otherwise inadmissible facts and data are to be admitted only if the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . . ." FED. R. EVID. 703. Under Rule 703, courts have held that "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Mohney v. U.S. Hockey, Inc.,* 300 F.Supp.2d 556, 565 (N.D.Ohio, 2004) (citations omitted).

Although some courts have stated that the factual basis of an expert opinion *generally* goes to the credibility of the testimony and not to its admissibility, those courts also acknowledge that the testimony may be excluded if it is fundamentally flawed or unsupported. *See e.g. Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 (stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking *shaky but admissible* evidence.") (emphasis added); *Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061 (8th Cir. 2002)("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . . Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."); *Tyler v. Union Oil Co. Of California,* 304 F.3d 379, 393 (5th Cir.2002)(concluding that the expert testimony was admissible because "[e]ven if flawed, [the] tests do not render [the expert's] entire analysis irrelevant" and stating that "absent some other infirmity, an analysis that accounts for the major factors will be admissible."). Thus, it is clear that courts consider the factual basis of an

expert's testimony when considering its reliability.

The Sixth Circuit is in accord. In *Coffey v. Dowley Mfg., Inc.,* 187 F.Supp.2d 958 (M.D.Tenn.2002), the district court concluded that the expert's methodology was unreliable and thus inadmissible, in part because the expert relied on "a number of 'guesstimations' and speculations." *Coffey,* 187 F.Supp.2d at 976. The district court concluded that "[l]ike a house of cards, once those foundations are disproved, the whole analysis collapses." *Id.* In affirming the decision, the Sixth Circuit agreed that the expert's analysis would be inaccurate if he used inaccurate data in his formula and noted that the expert failed to confirm his estimates in any way. *Coffey v. Dowley Mfg., Inc.,* 89 Fed.Appx. 927, 931–32 (6th Cir.2003).

Similarly, in *Hamilton County Emergency Commc'ns Dist. v. Orbacom Commc'ns Integrator Corp.,* 2005 WL 2076449 (E.D.Tenn.2005), the court stated that "[c]ourts should confirm the factual underpinnings of the expert's opinion are sound," even though vigorous cross-examination is the appropriate means of attacking "shaky but admissible" evidence. *Hamilton,* 2005 WL 2076449 at *1 (internal quotations and citations omitted). Although the *Hamilton* court ultimately deferred ruling on whether the shortcomings in the expert's testimony were a basis for exclusion or simply a matter left to vigorous cross-examination, the court discussed the reliability of the testimony in its opinion. *Id.* at *6. In so doing, the court found it "significant" that the expert relied exclusively on information and interpretations provided by the defendant, did not conduct more than a cursory investigation into the reliability of the sources upon which he relied for benchmark data, and did not attempt to identify or account for differ-

ences when he analogized to data on other topics. *Id.*

Here, Patzer's report contains several factual and methodological flaws that substantially undermine the reliability of his entire report. The record is replete with evidence that Patzer's testimony is not based on sufficient facts or data, Patzer's testimony is not the product of reliable principles and methods, and that Patzer did not apply the principles and methods reliably to the facts of this case, as required by Rule 702. Much like the experts in *Coffey* and *Hamilton,* Patzer relied exclusively on data provided by Ellipsis, failed to verify the information from the Realtree website or read the underlying study, estimated that an additional ten percent of the population would be interested in purchasing the camouflaged face plates without providing sufficient basis for such an estimate, predicted a growth in camouflaged face plate sales that mirrored that of camouflaged sunglasses without any specific basis for such an assumption, and failed to analyze many other factors that would affect his projection of the sale of camouflaged face plates. These flaws render Patzer's entire report unreliable and demonstrate that Patzer failed to apply "the same level of intellectual rigor that characterizes the practice in the relevant field." *Kumho,* at 152, 119 S.Ct. 1167. These flaws are also so substantial that admission of Patzer's report would not assist the trier of fact. Finally, the record is also unclear as to whether Patzer's modified "test market" is a reliable methodology that would pass muster under an analysis of the five non-exclusive *Daubert* factors.

## CONCLUSION

Because the methodology and data employed in Patzer's report are unreliable and because Alexander Ivy's report is predicated on Patzer's findings, the defendants motion to exclude the expert testimony of Emmons Patzer and Alexander Ivy is granted. Ellipsis and Mary Elizabeth Wade are excluded from introducing or relying upon any portion of Emmons Patzer and Alexander Ivy's testimony or their reports.